UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _10/24/22_

ANTONIO MALLET,

                              Plaintiff,

   -against-

NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY
SUPERVISION, et al.,

                              Defendants.

No. 22 Civ 01604 (CM)

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

McMahon, J.:

Plaintiff, Antonio Mallet ("Plaintiff"), brings this action under 42 U.S.C. § 1983 and state law against Defendants Dr. Mervat Makram, Dr. Thomas Vito Stellato, Dr. Anthony L. Ritaccio, John Doe Corrections Officers, Jane/John Doe Medical Personnel, the New York State Department of Correction and Community Supervision ("DOCCS"), its Commissioner Anthony Annucci, and the State of New York (collectively, "Defendants").

Plaintiff alleges constitutional claims under Section 1983 of cruel and unusual punishment, denial of care and deliberate indifference, retaliation, federal civil rights violations, failure to intervene, supervisory liability, and conspiracy. Plaintiff also asserts medical malpractice and negligence claims under state law.

Defendants move to dismiss Plaintiff's first amended complaint pursuant to Fed. R. Civ. Pro. 12(b)(1) and 12(b)(6), asserting primarily that Plaintiff's claims are time-barred because the

statute of limitations has run or, alternatively, that the Section 1983 claims do not rise to the level of a constitutional violation.

As all the Section 1983 claims in the first amended complaint are barred by limitations, they must be dismissed. As the constitutional claims are dismissed, the court declines to exercise supplemental jurisdiction over the state law claims.

## BACKGROUND

### I.   Factual Background

Plaintiff was an inmate in DOCCS custody from 1999 until his release on January 16, 2019. First Amended Complaint ("FAC") ¶ 10. During the periods relevant to this action – 2017 to 2019 – Plaintiff was housed in two different correctional facilities. From at least 2017 until four months prior to his release, Plaintiff was housed at Woodbourne Correctional facility. *Id.* He was then moved to Queensboro Correctional Facility as a final transition facility prior to his release from incarceration on parole. *Id.* ¶¶ 10, 55.

During the course of his incarceration at Woodbourne and Queensboro, Plaintiff complained of and was treated for urinary symptoms. FAC ¶¶ 22, 28, 56. After his release from incarceration, Defendant sought medical treatment, which culminated in Plaintiff's learning that he had advanced stage prostate cancer on or about May 19, 2021. *Id.* ¶ 69.

### A.   Plaintiff's Medical Treatment at Woodbourne Correctional Facility (2017-approximately September 2018)

Plaintiff alleges that, while incarcerated at Woodbourne, he exhibited and repeatedly complained of urinary obstructive symptoms that were rejected and ignored by medical personnel and correction officers. FAC ¶¶ 22, 28. For example, Plaintiff alleges that officers would state that he was lying about his condition as a means to hide his drug use. *Id.* ¶¶ 24, 26, 35. Otherwise, officers would ridicule him and make statements such as, "What do you think you are special? Go

2

to the bathroom like everyone else or do not go at all" or that Plaintiff should not expect good treatment in prison and that not everyone makes it out alive. *Id.* ¶¶ 27, 29.

The medical director of Woodbourne during the relevant period was Dr. Makram. FAC ¶ 14. Plaintiff alleges that Dr. Makram signed every medical report and note related to Plaintiff and supervised examinations of Plaintiff by nursing staff. *Id.* On April 21, 2017, Plaintiff requested that Dr. Makram send him to a specialist for his urinary issues. *Id.* ¶ 37. On September 7, 2017, Plaintiff was placed under the care of Dr. Stellato, who performed testing on Plaintiff's urological systems. *Id.* ¶ 38. Dr. Stellato performed a cystoscopy, which confirmed urinary retention, urinary obstructive symptoms and mild congestion of the prostatic lobe, posterior urethra and bladder neck. *Id.* The operative report included a post-operative diagnosis of urinary obstructive symptoms. *Id.* ¶ 39.

Dr. Stellato did not order any additional urological or prostate testing and instructed Plaintiff to continue taking Flomax, which is an alpha-blocker medication that helps with urinary dysfunction but does not treat prostate cancer. *Id.* ¶¶ 40, 46. Dr. Stellato also recommended that Plaintiff see a neurologist. FAC ¶ 43. A referral to neurology was made on September 13, 2017, which was scheduled for November 22, 2017. *Id.* ¶ 40.

On October 12, 2017, Plaintiff again noted urinary dysfunction symptoms. Dr. Makram reviewed this note and continued to prescribe Plaintiff with Flomax. FAC ¶ 45.

On October 20, 2017, Plaintiff noted urinary dysfunction symptoms, including upper quadrant pain when he used the bathroom and blood in the toilet. Dr. Makram reviewed this note but did not address these symptoms. FAC ¶ 47.

On November 22, 2017, Plaintiff was examined by Dr. Ritaccio, who was tasked to perform follow up testing and examination of Plaintiff as a neurologist. FAC ¶¶ 16, 48. During the

relevant period, Dr. Ritaccio was a professor of medicine at Albany College and a physician licensed in the State of Florida, not in the State of New York. *Id.* ¶ 16. Dr. Ritaccio noted that Plaintiff still had symptoms of urinary retention and bladder dysfunction. *Id.* ¶ 48. He questioned why a neurological evaluation was required for bladder dysfunction and wrote, "I am not a neurologist. I don't have a differential for this." *Id.* Dr. Makram reviewed this note and continued to prescribe Flomax but took no further actions. *Id.*

On four further occasions between November 27, 2017 and September 14, 2018, Plaintiff complained of urinary symptoms. Each time, Dr Makram reviewed the notes but took no further action. FAC ¶¶ 49-53. On June 25, 2018, Plaintiff's attorney sent a letter to the warden of Woodbourne advising of the lack of adequate treatment, but no action was taken. *Id.* ¶ 52.

**B.    Plaintiff's Medical Treatment at Queensboro Correctional Facility (approximately September 2018 – January 16, 2019)**

During the last four months of his incarceration, Plaintiff was housed at Queensboro Correctional Facility. FAC ¶ 55.

While at Queensboro, Plaintiff continued to complain of urinary symptoms, including blockage and difficulty urinating. FAC ¶ 56. Plaintiff was examined by Dr. Williams, who continued to prescribe Plaintiff with Flomax.[1] *Id.* Specifically, Dr. Williams advised Plaintiff that she read his medical records and charts and would not deviate from the prior recommendations and prescriptions by Dr. Makram. *Id.* ¶ 57. Dr. Williams stated that she would not change Plaintiff's treatment after so many years of consistent treatment and especially while Plaintiff was

---

[1] While Plaintiff named Jane/John Doe Medical Personnel 1-10 (medical personnel, nurses, technicians and other medical providers employed at Woodbourne and Queensboro) as Defendants, Dr. Williams is not named as a Defendant. Moreover, the Clerk of Court rejected the request for the issuance of a "Jane/John Doe" summons, and as far as the court is aware, no effort has been made subsequently to learn the name of these individuals.

being housed in his final transition facility before release. *Id.* ¶ 58. She told Plaintiff, "when you get out, hopefully you will get better treatment." *Id.* ¶ 58.

### C.    Plaintiff's Medical Treatment Following Release (January 16, 2019 - present)

After his release from incarceration on January 16, 2019, Plaintiff first sought medical treatment on or about July 2019. FAC ¶ 60. Plaintiff had been using his left over Flomax prescriptions until this point. *Id.* Following this visit, Plaintiff was referred to a urologist. *Id.* ¶ 62. Plaintiff saw a urologist on three occasions between August 10, 2020 and February 16, 2021. *Id.* ¶ 64-67. On each occasion a prostate-specific-antigen ("PSA") blood test was performed and Plaintiff was noted to have an elevated PSA level. *Id.* Plaintiff was given medication to shrink the prostate. *Id.* On April 6, 2021, a biopsy of the prostate was performed, which noted a large tumorous carcinoma. *Id.* ¶ 69. On June 10, 2021 Plaintiff received a robotic assisted radical prostatectomy. *Id.* ¶ 71. The surgical report noted very aggressive prostate cancer. *Id.* Plaintiff's chance of survival from the cancer is non-existent as the prostate cancer has metastasized. *Id.* ¶ 73. Plaintiff must now use a bag to urinate, cannot create viable semen, and suffers from severe pain daily. *Id.*

## II.    Procedural Posture

Plaintiff initiated this action by filing a complaint on February 25, 2022. *See* Dkt. No. 1. Plaintiff filed the FAC on June 30, 2022. *See* Dkt. No. 36. The FAC asserts seven causes of action under 42 U.S.C. § 1983 for (1) cruel and unusual punishment; (2) denial of medical care and deliberate indifference; (3) retaliation; (4) federal civil rights violations; (5) failure to intervene; (6) supervisory liability; and (7) conspiracy. Plaintiff also asserts two state law claims for medical malpractice and negligence.

Defendants moved to dismiss the FAC pursuant to 12(b)(1) and 12(b)(6) on July 15, 2022. *See* Dkt. No. 39. Defendants assert that the constitutional claims accrued more than three years prior to filing the complaint and thus are time barred, or in the alternative, that they do not rise to the level of a constitutional violation. They also argue for dismissal based on sovereign immunity (insofar the State defendants are sued in their official capacity), qualified immunity, and other failures to state a claim under 12(b)(6). *See* Dkt. No. 40 at 1-2. Defendants further assert that, should the constitutional claims be dismissed, the court should not exercise supplemental jurisdiction over the state law claims. *Id.*

## LEGAL STANDARD

An argument that the statute of limitations bars a claim is properly raised in a motion to dismiss under Rule 12(b)(6). *Adams v. Crystal City Marriott Hotel*, No. 02–cv–10258, 2004 WL 744489, at *2–3 (S.D.N.Y. Apr. 6, 2004); *Harriman v. IRS*, 233 F.Supp.2d 451, 455 (E.D.N.Y. 2002). To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[A]ll reasonable inferences should be drawn in favor of the plaintiff," but the "complaint must contain sufficient allegations to nudge a claim 'across the line from conceivable to plausible.'" *Sphere Digital, LLC v. Armstrong*, No. 20-cv-4313 (CM), 2020 WL 6064156, at *4 (S.D.N.Y. Oct. 14, 2020) (quoting *Twombly*, 550 U.S. at 555). Where a plaintiff fails to "nudge[] their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

Federal Rule 12(b)(6) "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of" the truth of the allegations. *Id.* at 545.

On a motion to dismiss pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has subject matter jurisdiction over the action. *Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir. 1996). In resolving the question of jurisdiction, the court can resolve disputed issues of fact by referring to evidence outside the pleadings. The plaintiff asserting subject matter jurisdiction has the burden of proving that it exists by a preponderance of the evidence. *Luckett v. Bure*, 290 F.3d 493, 496-97 (2d Cir. 2000); *Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000).

## DISCUSSION

### I.    The Section 1983 Claims are Time-Barred by the Statute of Limitations

Section 1983 actions filed in New York are subject to a three-year statute of limitations. *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013); *Shomo v. City of New York*, 579 F.3d 176, 180–81 (2d Cir. 2009). While the length of the limitations period is determined by state law, federal law governs the determination of the accrual date for the purposes of a Section 1983 claim. *Pearl v. City of Long Beach*, 296 F.3d 76, 80 (2d Cir. 2002). Claims brought pursuant to Section 1983 accrue when the plaintiff "'knows or has reason to know of the harm.'" *Shomo*, 579 F.3d at 181 (quoting *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994)). "The crucial time for accrual purposes is when the plaintiff becomes aware that he [or she] is suffering from a wrong for which damages may be recovered in a civil action." *Singleton v. City of New York*, 632 F.2d 185, 192 (2d Cir. 1980).

Defendants assert that the Plaintiff's constitutional claims are time-barred as the claims accrued at the time when the constitutional violation allegedly occurred. *See* Dkt. No. 40 at 7. They argue that, as Plaintiff was released from DOCCS' custody on January 16, 2019 and his complaint was not filed until February 25, 2022 – more than three years later – the statute of limitations had run, and the claims must be dismissed.

Plaintiff argues that the claims did not accrue until Plaintiff was informed that the biopsy of his prostate was positive for adenocarcinoma in May 2021. *See* Dkt. No. 41 at 9. Prior to that date, Plaintiff had "no reason to believe he had been harmed by the defendants' deliberate indifference to his medical needs and other civil rights." *Id.* Instead, Plaintiff states that he was repeatedly led to believe that he merely had an innocuous urinary issue. *Id.* at 10.

"A claim of deliberate indifference of medical needs brought under Section 1983 accrues when medical treatment is denied." *Miles v. City of New York*, No. 14-CV-9302 (VSB), 2018 WL 3708657, at *10 (S.D.N.Y. Aug. 3, 2018); *see also Harris v. Viau*, No. 17-CV-9746 (KMK), 2019 WL 1978596, at *4 (S.D.N.Y. May 3, 2019); *Traore v. Police Office Andrew Ali Shield*, No. 14 Civ. 8463 (ER), 2016 WL 316856, at *5 (S.D.N.Y. Jan. 26, 2016). In *Miles*, the plaintiff alleged that he was subjected to excessive force during the course of his arrest. He was transported to a hospital where he complained of severe pain, but defendant failed to physically examine the plaintiff or provide him with medication. The court determined that plaintiff's claims accrued on the date that plaintiff was denied treatment for his injuries, not on the later date when the plaintiff was informed that he had sustained pelvic fractures, spinal disc tissue damages and nerve damages. *Miles*, 2018 WL 3708657.

Plaintiff's FAC states that during his two years in DOCCS custody, Plaintiff repeatedly complained of severe urinary symptoms and pain, but he was only prescribed Flomax – which did

nothing to relieve Plaintiff's symptoms. Further, beyond the cystoscopy that was performed in September 2017, Plaintiff did not undergo any additional testing or analysis for his urinary issues. Instead, Plaintiff was recommended for a neurological evaluation, but this evaluation was ultimately performed by a physician who not only was not a neurologist but also questioned why a neurological evaluation was recommended for bladder dysfunction. These allegations of serious urological symptoms together with the allegations of Defendants' response to such symptoms (or lack thereof) indicate that Plaintiff had reason to know that he was suffering a harm at the hands of Defendants during his incarceration. Moreover, Plaintiff's awareness of an injury is evidenced through the June 25, 2018 letter sent by Plaintiff's attorney to the warden of Woodbourne advising of the lack of adequate treatment Plaintiff was receiving. FAC ¶ 52.

Plaintiff states that only upon his diagnosis of advanced prostate cancer did he begin to suspect he "may have been a victim of the Defendants' failure to properly treat, diagnose, and care for his prostate." *Id.* ¶ 72. However, delay in discovering the extent and cause of the injury does not prevent a claim from accruing – "In applying a discovery accrual rule, we have been at pains to explain that discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." *Rotella v. Wood*, 528 U.S. 549, 555, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000). In this case, the injury is failure to treat – not the apparent effects of that failure.

Further, Plaintiff cannot assert a continuing violation to bring the claims within the statute of limitations. The continuing violation doctrine acts as an exception to the normal accrual date calculation in Section 1983 cases. *Shomo*, 579 F.3d at 180–81. This doctrine, which is typically applied in discrimination cases, provides "the commencement of the statute of limitations period may be delayed until the last [wrongful] act in furtherance of it." *Id.* However, in this case, even if the continuing violation doctrine applied, every action by the Defendants that forms the basis of

Plaintiff's claims took place prior to the date that Plaintiff was released from prison – January 16, 2019 – which was more than three years before he commenced this lawsuit. "In a case where the suit charges that the defendants inflicted cruel and unusual punishment on the plaintiff by refusing to treat his medical condition while the plaintiff is in prison, the refusal continues for as long as the defendants had the power to do something about the plaintiff's condition, which is to say until he leaves the jail." *Rashid v. McGraw*, No. 01 CIV. 10996 (DAB), 2006 WL 1378945, at *4 (S.D.N.Y. May 18, 2006) (quoting *Heard v. Sheahan*, 253 F.3d 316, 318 (7th Cir.2001)) (internal citations omitted); *Laureano v. Goord*, No. 06 CIV. 7845 SHS RLE, 2007 WL 2826649, at *3 (S.D.N.Y. Aug. 31, 2007), report and recommendation adopted, No. 06 CIV. 7845 SHS, 2007 WL 2852770 (S.D.N.Y. Sept. 28, 2007).

As the three-year statute of limitations accrues from, at the latest, January 16, 2019 – the date of Plaintiff's release from incarceration – the Section 1983 claims must be DISMISSED.

## II. As the Section 1983 Claims are Time-Barred, the Court Declines to Exercise Supplemental Jurisdiction Over the State Law Claims

Plaintiff asserts two claims for medical malpractice and negligence under New York law.

A district court may decline to exercise supplemental jurisdiction over state-law claims when it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Generally, "when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

Having dismissed the federal claims over which the Court has original jurisdiction, the Court declines to exercise its supplemental jurisdiction over Plaintiff's state law claims. *See Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("Subsection (c) of § 1367 'confirms the discretionary nature of supplemental jurisdiction by enumerating the circumstances

in which district courts can refuse its exercise.'") (quoting *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997)). Plaintiff's state law claims are therefore dismissed without prejudice to Plaintiff's refiling them in an appropriate court.

## CONCLUSION

For the reasons discussed above, the motion to dismiss Plaintiff's claims is GRANTED.

This constitutes the decision and order of the court. It is a written opinion. The Clerk of Court is respectfully directed to terminate the motions at Docket Number 39.

Dated: October 24, 2022
       New York, New York

_____
                                U.S.D.J.

BY ECF TO ALL COUNSEL

11