1  **IN THE**

2  # United States Court of Appeals

3  ## For the Second Circuit

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Jan 13 2025

_____

4
5  AUGUST TERM, 2023
6
7  ARGUED: SEPTEMBER 20, 2023
8  DECIDED: JANUARY 13, 2025
9
10  Docket No. 22-2884
11
12  ANTONIO MALLET,
13  *Plaintiff-Appellant,*
14
15  *v.*
16
17  NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION,
18  ANTHONY J. ANNUCCI, in his official capacity as the acting commissioner of the
19  New York State Department of Corrections and Community Supervision, STATE
20  OF NEW YORK, DR. MERVAT R. MAKRAM, DR. THOMAS VITO STELLATO, DR.
21  ANTHONY L. RITACCIO,
22  *Defendants-Appellees,*
23
24  JOHN DOES, CORRECTIONS OFFICERS 1-10, JANE/JOHN DOES and MEDICAL
25  PERSONNEL 1-10,
26  *Defendants,*
27  OFFICE OF NEW YORK STATE ATTORNEY GENERAL,
28
29  *Interested-Party.*
30  _____
31
32  Appeal from the United States District Court
33  for the Southern District of New York
34  Docket No. 1:22-cv-01604 – Colleen McMahon, *District Judge.*
35  _____
36
37  Before: CALABRESI, MENASHI, and PÉREZ, *Circuit Judges.*

CERTIFIED COPY ISSUED ON 01/13/2025

1          _____

2          While he was incarcerated at Woodborne Correctional Facility, Plaintiff-
3    Appellant Antonio Mallet repeatedly sought medical care for urinary obstruction
4    and painful urination. These are classic symptoms of prostate cancer. While Mallet
5    was referred to a physician for a cystoscopy, the prison doctors failed to conduct
6    any additional testing to investigate the worrisome cystoscopy results or to look
7    further for prostate cancer. Instead, Mallet was prescribed medication to treat a
8    benign enlarged prostate and led to believe that his urinary symptoms would
9    resolve in due course. They did not.

10         Mallet was released on parole in January 2019. With the opportunity to
11   consult outside medical providers, he was eventually diagnosed with late-stage
12   prostate cancer in May 2021. On February 25, 2022, Mallet sued the State of New
13   York, the New York State Department of Corrections and Community Supervision
14   ("DOCCS"), Anthony J. Annucci in his official capacity as the acting commissioner
15   of DOCCS, and three medical providers Mallet saw while incarcerated, Dr. Mervat
16   Makram, Dr. Thomas Stellato, and Professor Anthony Ritaccio. Mallet's complaint
17   alleged deliberate indifference to his medical needs in violation of the Eighth
18   Amendment, as well as other Fifth, Eighth, and Fourteenth Amendment
19   violations, retaliation, conspiracy, malpractice, and negligence. Upon motion from
20   the defendants, the district court (McMahon, *J.*) dismissed the constitutional
21   claims as untimely, reasoning that the deliberate indifference claim must have
22   accrued by the time Mallet was released from custody in January 2019 and,
23   therefore, was not within the three-year statute of limitations for Section 1983
24   claims in New York State. Having dismissed the constitutional claims, the district
25   court declined to exercise supplemental jurisdiction over the remaining state law
26   claims pursuant to 28 U.S.C. § 1367(c)(3).

27         We find that, based on the facts alleged in the complaint, it is plausible that
28   Mallet's deliberate indifference claim had not accrued by February 25, 2019, and
29   thus it is also plausible that his complaint was filed within the three-year
30   limitations period. Furthermore, with respect to defendants Dr. Makram and Dr.
31   Stellato, we reject Defendants-Appellees' argument that the judgment can be

affirmed on the alternative ground that the Eighth Amendment claims are implausible. We, however, find that Mallet has failed to state a plausible Eighth Amendment claim against Professor Ritaccio, and we also find that the constitutional claims against New York State, DOCCS, and Annucci acting in his official capacity are barred by sovereign immunity. We therefore **AFFIRM in part**, **REVERSE in part**, and **VACATE in part**, and the case is **REMANDED** for further proceedings.

Judge Menashi dissents in a separate opinion.

---

CANER DEMIRAYAK, Law Office of Caner Demirayak, Esq., *for Plaintiff-Appellant*.

DANIEL S. MAGY, Office of the New York State Attorney General, *for Defendants-Appellees*.

---

CALABRESI, *Circuit Judge*:

This case asks us to apply the established rule for statutes of limitations—that they accrue when the plaintiff knew or should have known the facts that establish their claim—to Antonio Mallet's allegation that New York State, the New York State Department of Corrections and Community Supervision, the Department's acting commissioner at the time of his incarceration, and Dr. Mervat Makram, Dr. Thomas Stellato, and Professor Anthony Ritaccio (collectively, "Defendants-Appellees") acted with deliberate indifference in failing to treat Mallet's prostate cancer while he was incarcerated.

1    The United States District Court for the Southern District of New York

2    (McMahon, *J.*) granted the Defendants-Appellees' Rule 12(b)(6) motion and

3    dismissed Mallet's suit as untimely. Mallet alleges, and at this stage we must

4    accept, that when he repeatedly sought treatment for his urinary symptoms, he

5    did not recognize those symptoms as telltale signs of prostate cancer—but the

6    Defendants-Appellees did, and they consciously disregarded that risk. Because

7    the injury for which Mallet seeks relief is cancer, the relevant question is when he

8    knew or should have reasonably known that he had prostate cancer. This is a

9    question of fact, but at this stage, it is very plausible that Mallet acquired this

10   knowledge less than three years before he filed this suit, rendering his claims

11   timely.

12   Therefore, we reverse the district court's dismissal of Mallet's deliberate

13   indifference claims against Dr. Makram and Dr. Stellato. We also vacate the

14   dismissal of the other six constitutional claims against Dr. Makram, Dr. Stellato,

15   and Professor Ritaccio and the dismissal of the state claims against all Defendants-

16   Appellants. We, however, affirm the dismissal of the deliberate indifference claim

17   against Professor Ritaccio as implausible and the dismissal of all constitutional

1   claims against New York, DOCCS, and Anthony Annucci as barred by sovereign

2   immunity.

3                                        **BACKGROUND**

4          **A. Factual Background**[1]

5          Antonio Mallet was an inmate in the custody of DOCCS from 1999 to 2019.

6   On April 21, 2017, while incarcerated at Woodborne Correctional Facility, Mallet

7   asked his primary care provider Dr. Mervat Makram for a referral to a specialist

8   who could treat symptoms of urinary obstruction. On September 7, 2017, Mallet

9   was examined by Dr. Thomas Stellato, a urologist at Kingston Urological

10  Associates. Dr. Stellato performed a cystoscopy, "which confirmed urinary

11  retention, urinary obstructive symptoms and mild congestion of the prostatic lobe,

12  posterior urethra and bladder neck" and also revealed "evidence of bladder

13  trabeculation +1." J. App'x at 14. These results, Mallet alleges, "would lead any

---

[1] All citations to the record refer to Mallet's amended complaint.

1 reasonable medical professional to order additional testing to rule out prostate

2 cancer." *Id.*

3      But Dr. Stellato did not order additional testing for prostate cancer. Instead,

4 he recommended that Mallet take Flomax, "an alpha-blocker medication that

5 helps with urinary dysfunction" but "neither treats nor addresses prostate

6 cancer." *Id.* at 15. He also recommended that Mallet be seen by a neurologist,

7 "without any explanation as to how a neurologist would have any ability to

8 inspect [Mallet's] urological systems." *Id.* at 14. Dr. Makram reviewed Dr.

9 Stellato's clinical report, and she too did not order any additional testing for

10 prostate cancer. But she did refer Mallet to a neurologist at Dr. Stellato's

11 recommendation.

12      On October 12, 2017, Mallet again complained of urinary dysfunction to the

13 Woodborne medical staff, and he was again advised to continue taking Flomax.

14 Dr. Makram reviewed the note from this encounter and continued to prescribe the

15 medication without conducting further testing to detect or rule out prostate

16 cancer. One week later, on October 20, 2017, Mallet complained of upper

17 abdominal pain and reported blood in the toilet. Dr. Makram "reviewed this note"

and personally examined Mallet, but, once again, she "did not address the urinary

symptoms and clinical signs of prostate cancer." *Id.* at 15.

On November 22, 2017, Mallet was examined by Anthony Ritaccio, a

Professor of Medicine at Albany College who is unlicensed to practice medicine in

the State of New York. Professor Ritaccio was "tasked by the governmental

defendants to perform follow up testing and examination of plaintiff as a

neurologist." *Id.* at 11. In his subsequent report of the encounter, Professor Ritaccio

wrote a note saying, "I am not a neurologist. I don't have a differential for this."

*Id.* at 15. He also questioned why Dr. Stellato had referred Mallet to a neurology

professor to treat urinary obstruction. Dr. Makram reviewed Professor Ritaccio's

notes but again "took no other actions." *Id.*

On November 27, 2017, Mallet again reported urinary retention to the

attending nurse at Woodborne. He made similar reports on March 5 and 6, 2018.

And then again on September 14, 2018. Each time, Dr. Makram and her staff "did

nothing to address" the indications of prostate cancer. *Id.* at 16. Moreover, their

records from the March visits "falsely stated" that Mallet's cystoscopy in September had "yielded negative results." *Id.*

During this period, "officers and nurses would call [Mallet] scum for continuing to ask for medical treatment," insisting that he was faking his inability to urinate so that he could avoid a positive drug test. J. App'x at 12–13. They also told Mallet that "he would only get the minimum treatment the State will allow at the behest of [Dr. Makram]," that "he should not expect good treatment in prison[,] and that not everyone makes it out alive." *Id.* at 13.

In the fall of 2018, Mallet was transferred to Queensboro Correctional Facility in anticipation of his upcoming parole. There, he was examined by another medical provider who reviewed his records from Woodborne. This provider told Mallet that she was unwilling to "change his treatment or prescriptions . . . after so many years of consistent treatment," but she added that once Mallet was released on parole, he would "hopefully . . . get better treatment." J. App'x at 17.

Mallet was paroled on January 16, 2019. It had been over twenty months since he first complained of urinary difficulties**.** In July 2019, Mallet sought treatment for his persistent symptoms at Woodhull Hospital, and he was eventually referred to a urologist. Until this, Mallet had been using the remaining

8

1 Flomax prescription and "was not aware of any cancer in his prostate." When

2 Mallet saw the urologist on August 10, 2020, he was found to have an elevated

3 Prostate-Specific Antigen ("PSA") level of 8.43.[2] The urologist prescribed

4 medication "in an attempt to shrink the prostate to determine possible causes of

5 the elevated PSA level and urinary blockage." J. App'x at 18. At follow-up visits

6 on October 14, 2020, and February 16, 2021, Mallet's PSA levels were slightly

7 reduced from the August test but still abnormally high.

8 On April 6, 2021, the urologist performed a biopsy of Mallet's prostate,

9 which ultimately revealed "a large tumorous carcinoma." J. App'x at 18. On June

10 10, 2021, Mallet "was forced to undergo a robotic assisted radical prostatectomy

11 due to the advanced prostate cancer." *Id.* The post-operative report from the

12 surgery "noted a Gleason score of 10 out of 10 (indicative of very aggressive

13 cancer) and adenocarcinoma of the prostate." *Id*. Mallet alleges that it was around

14 this time, in the late spring of 2021, that he first "began to suspect he may have

---

[2] Mallet alleges that his urology appointment was delayed due to his difficulties finding health insurance combined with the COVID-19 lockdown restrictions.

9

1   been a victim of the defendants' failure to properly treat, diagnose and care for his

2   prostate." *Id.* at 19.

3        Mallet now uses a bag to urinate and can no longer produce viable semen.

4   He also suffers from daily severe pain, and, as of June 2022, was expected to have

5   at least three more surgeries—including a penile prothesis implantation. As for his

6   life expectancy, Mallet states that his "chance of survival from the cancer is non-

7   existent as the prostate cancer has metastasized." *Id.*

8   **B. Procedural History**

9        Mallet filed his initial complaint on February 25, 2022, followed by an

10   amended complaint on June 30, 2022. The amended complaint included seven

11   claims under  42 U.S.C. § 1983 alleging: (1) deliberate indifference to a serious

12   medical condition in violation of the Eighth Amendment; (2) denial of medical care

13   in violation of the Fourteenth Amendment; (3) retaliation; (4) other violations of

14   the Fifth, Eighth, and Fourteenth Amendments; (5) failure to intervene in

15   constitutional rights violations; (6) supervisory liability for constitutional rights

16   violations; and (7) conspiracy to violate constitutional rights ("the constitutional

1   claims"). The amended complaint also included two state law claims for (8)

2   medical malpractice and (9) negligence.

3       Defendants-Appellees moved to dismiss the amended complaint pursuant

4   to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). They argued that: (a) the

5   constitutional claims were time-barred; (b) the constitutional claims were

6   implausible; (c) the individual defendants were covered by qualified immunity on

7   the constitutional claims; (d) the state defendants were covered by sovereign

8   immunity on the constitutional claims; (e) the state law claims against the

9   individual defendants could not be brought in federal court under New York

10  statutory law; and (f) the court should decline to exercise supplemental

11  jurisdiction over the remaining state law claims once the constitutional claims

12  were dismissed.

13      The district court granted the motion to dismiss based on the statute of

14  limitations for the deliberate indifference claim. The district court reasoned that

15  Mallet's Eighth Amendment claim must have accrued, at the latest, by the time he

16  was released from prison in January 2019 because he should have known that he

17  was (allegedly) being treated with deliberate indifference while he was

18  incarcerated. Accordingly, the district court determined that Mallet's

1    constitutional claims were untimely because Section 1983 claims have a three-year

2    statute of limitations in New York, yet Mallet's complaint was filed more than

3    three years after the latest possible accrual date.[3] Having dismissed the

4    constitutional claims, the district court declined to exercise supplemental

5    jurisdiction over the remaining state law claims and dismissed them without

6    prejudice. Mallet timely appealed.

7                                        **DISCUSSION**

8    **A. Standard of Review**

9         "We review *de novo* a district court's grant of a motion to dismiss, including

10   its legal interpretation and application of a statute of limitations." *Deutsche Bank*

11   *Nat'l Tr. Co. v. Quicken Loans Inc.*, 810 F.3d 861, 865 (2d Cir. 2015) (citation omitted).

12   "To survive a motion to dismiss, a complaint must contain sufficient factual

13   matter, accepted as true, to state a claim to relief that is plausible on its face." *Shomo*

14   *v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009) (internal quotation marks

15   omitted) (quoting *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009)).

_____

[3] The district court analyzed the timeliness of all seven constitutional claims using the accrual date for the Eighth Amendment claim, and neither party argues on appeal that the constitutional claims might have accrued on different dates. We therefore proceed on the assumption that the timeliness of all seven constitutional claims rises and falls with that of the Eighth Amendment claim.

**B. Accrual**

A Section 1983 claim does not accrue until the plaintiff "has a complete and present cause of action." *Smith v. Campbell*, 782 F.3d 93, 100 (2d Cir. 2015) (internal quotation marks omitted); *see also Wallace v. Kato*, 549 U.S. 384, 388 (2007). The accrual analysis involves two steps. We begin by "identifying the specific constitutional right alleged to have been infringed." *McDonough v. Smith*, 588 U.S. 109, 115 (2019) (internal quotation marks omitted); *see also, e.g.*, *Campbell*, 782 F.3d at 100 (reviewing the elements of a First Amendment retaliation claim to determine accrual date). Next, we ask when the plaintiff knew or had reason to know of "the injury which is the basis of his action," *i.e.*, the alleged injury which—according to the plaintiff—amounts to an infringement of that constitutional right. *Singleton v. City of New York*, 632 F.2d 185, 191 (2d Cir. 1980); *see also Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994). In both steps of this analysis, we may look to "common-law principles governing analogous torts" as a "source of inspired examples." *McDonough*, 588 U.S. at 116 (internal quotation marks omitted). But the accrual date of a Section 1983 claim is ultimately a "question of federal law," *Wallace*, 549 U.S. at 388, and as such our analysis is governed by federal "articulations of the right at issue and its contours." *McDonough*, 588 U.S. at 115.

1    Mallet claims that his Eighth Amendment right to be free from cruel and

2    unusual punishment was infringed by Defendants-Appellees' "deliberate

3    indifference" to his "serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104

4    (1976). "The standard of deliberate indifference includes both subjective and

5    objective components." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). First,

6    Mallet must show that, while he was incarcerated, he suffered from a medical

7    condition that is, "in objective terms, sufficiently serious." *Id.* (internal quotation

8    marks omitted). Though there is no single metric, we have previously held that a

9    "sufficiently serious" medical condition in the Eighth Amendment context refers

10   to a "condition of urgency that may result in degeneration or extreme pain," *id.*,

11   that "significantly affects daily activities," or that involves "chronic and

12   substantial pain." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003) (internal

13   quotation marks omitted). The condition need not be "life-threatening" or "at the

14   limit of human ability to bear," but it must be more than simply "uncomfortable

15   and annoying." *Id.* at 163; *see also Collymore v. Myers*, 74 F.4th 22, 30 (2d Cir. 2023)

16   (noting that Eighth Amendment deliberate indifference claim will be dismissed

17   unless "a plaintiff plausibly alleges a condition that produces severe and

18   unmanaged pain").

1      If Mallet can prove that he suffered from an objectively serious medical

2    condition within the meaning of the Eighth Amendment, he will then have to

3    establish that Defendants-Appellees acted with a "sufficiently culpable state of

4    mind." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1996). To prevail, he must show

5    that the acts or omissions of Defendants-Appellees "evince[d] a conscious

6    disregard of a substantial risk of serious harm." *Darby v. Greenman*, 14 F.4th 124,

7    128 (2d Cir. 2021) (internal quotation marks omitted); *see also Farmer v. Brennan*,

8    511 U.S. 825, 835 (1994).

9       Taken together, then, Mallet's deliberate indifference claim could not have

10   accrued until he either knew or had reason to know both (1) that he suffered from

11   an objectively serious medical condition while he was incarcerated and (2) that

12   Defendants-Appellees failed to provide adequate treatment because they

13   consciously disregarded a substantial risk to his health and safety. Put differently,

14   Mallet could not have brought his deliberate indifference claim before he knew or

15   should have known these facts because he would not yet have had a complete and

16   present cause of action. *See Campbell*, 782 F.3d at 100.

17      Under this standard, the accrual analysis for an Eighth Amendment

18   deliberate indifference claim often raises factual questions about when a plaintiff

1    knew or should have known of the circumstances tending to establish either the

2    objective or subjective components of the alleged violation. *Cf. Barret v. United*

3    *States*, 689 F.2d 324, 333 (2d Cir. 1982) (finding that there were outstanding  issues

4    of fact raised by the accrual test for a medical malpractice claim); *Kronish v. United*

5    *States*, 150 F.3d 112, 124 (2d Cir. 1998) (noting that the *Bivens* claim accrual analysis

6    may raise a "question for the jury" about when the plaintiff knew or should have

7    known of his alleged constitutional injury). These factual issues must, as always,

8    be dealt with in a way that is appropriate to the relevant stage of litigation. Where,

9    as here, the statute-of-limitations defense has been raised at the pleadings stage,

10   all factual allegations in the complaint must be accepted as true, and all reasonable

11   inferences must be drawn in the plaintiff's favor. *See Shomo*, 579 F.3d at 183.

12        Mallet's complaint alleges that he neither knew nor should have known that

13   he was suffering from the serious medical condition of prostate cancer until after

14   he was released from custody. When all reasonable inferences are drawn in his

15   favor, this claim is entirely plausible. Indeed, the gravamen of Mallet's complaint

16   is that none of the medial providers he saw while incarcerated told him that he

17   was exhibiting classic symptoms of prostate cancer or conducted the appropriate

18   screening tests. Thus, although Mallet surely knew that he had some kind of

1    persistent medical problem which the Flomax was not addressing—which, we can

2    only assume, is why he continued to speak with providers about his urinary

3    issues—it is not reasonable to infer that he either knew or should have known that

4    he was suffering from *this particular* serious medical condition—cancer—when

5    none of the doctors he saw in prison gave him any indication that his condition

6    was possibly cancer. *Cf. Toal v. United States*, 438 F.2d 222, 225 (2d Cir. 1971)

7    (finding no clear error in district court's determination that malpractice claim had

8    not accrued while plaintiff continued to rely on his doctor's "confident prognosis"

9    that he "needn't worry" about his persistent symptoms).[4] Throughout his

10   incarceration, then, Mallet could have reasonably assumed that he was

11   experiencing "uncomfortable and annoying" urinary problems, which might

---

[4] To be sure, this principle from *Toal* was later called into question by *United States v. Kubrick*, 444 U.S. 111 (1979). In *Kubrick*, the Supreme Court held that a malpractice claim brought under the Federal Tort Claims Act ("FTCA") accrues when a reasonable person in the plaintiff's position would have "made inquiry among doctors with average training and experience in such matters" and, having done so, would have been told that "the defendant ha[d] failed to live up to minimum standards of medical proficiency." *Id.* at 122–23.

The instant case is not controlled by *Kubrick*, however. Neither we nor the Supreme Court has ever held that the *Kubrick* accrual rule applies to Eighth Amendment claims. And with good reason: unlike the plaintiff in *Kubrick*, an incarcerated person is not necessarily able to make her or his own independent inquiries about the quality of care she or he receives in prison. In this sense, she or he often *is* "at the mercy of" the very actors allegedly denying her proper medical treatment. *See Kubrick*, 444 U.S. at 122. For this reason, we find it entirely appropriate to continue to use *Toal*'s accrual standard in the context of Eighth Amendment claims.

1  qualify as serious, but not the symptoms of the serious underlying condition—

2  cancer—as to which he is suing. *Brock*, 315 F.3d at 163. Therefore, it is plausible

3  that his deliberate indifference claim had not accrued by the time he was released

4  from prison.[5]

5      Nonetheless, Mallet's further claim that he neither knew nor should have

6  known that he had this particular serious medical condition until he was officially

7  diagnosed with prostate cancer in May 2021 is *not* plausible, considering the other

8  facts alleged in his complaint. For example, Mallet alleges that when he visited the

9  urologist on August 10, 2020, he was found to have an elevated PSA level and was

10 prescribed a new medication to shrink his prostate. And then on April 6, 2021,

11 once that medication also proved ineffective, the urologist conducted a biopsy of

12 his prostate. Thus, Mallet was presumably put on notice that he had this specific

---

[5] In its decision below, the district court referenced a letter that Mallet's attorney wrote to the prison superintendent on June 25, 2018, asking why Mallet had not yet been treated for "a painful herniated disc in his back." J. App'x at 71. According to the district court, this letter demonstrated Mallet's "awareness of an injury" during his incarceration. *Id.* at 123. Nonetheless, because the letter dealt with a separate medical issue, Defendants-Appellees rightfully concede on appeal that this "letter is not necessary to determine when Mallet's federal law claims accrued." Appellees' Br. at 18 n.2.

1    serious medical condition related to his prostate issues earlier in the treatment

2    process, before he got the official cancer diagnosis.[6]

3            This means that, based on the facts alleged in the complaint, Mallet's claim

4    must have accrued at some point after his release in January 2019 but before his

5    diagnosis in the late spring of 2021. Determining the exact accrual date in this

6    context may ultimately be a task for the factfinder. *See Eagleston*, 41 F.3d at 871. It

7    will depend, most of all, on what exactly Mallet's post-release providers told him

8    and when they told him. Nonetheless, based on the pleadings alone, we find it

9    entirely plausible that Mallet neither knew nor should have known that his

10   condition was not only serious but potentially cancer until, say, August 2020,

11   when the first PSA test was administered. And if that is so, then it is also plausible

12   that Mallet's claim was timely, since Mallet's complaint was filed less than three

---

[6] We recognize that this result differs from those reached by our sister circuits in *Devbrow v. Kalu*, 705 F.3d 765, 769 (7th Cir. 2013) (holding that because plaintiff's specific theory of deliberate indifference as alleged in his complaint was that the prison doctors culpably allowed his prostate cancer to metastasize, *his* deliberate indifference claim did not accrue until he was diagnosed with late-stage cancer) and *Lawson v. Okmulgee Cnty. Crim. Just. Auth.*, 726 F. App'x 685, 691 (10th Cir. 2018) (affirming the dismissal of a deliberate indifference claim as untimely because the claim must have accrued *at the latest* when the plaintiff learned he had cancer).

To the extent that those cases should be read as adopting a bright-line rule that a deliberate indifference claim for failure to diagnose and treat cancer cannot accrue until the plaintiff is officially diagnosed, we respectfully depart from that approach. However, we do not think that those cases are best read as adopting such a bright-line rule; therefore, contrary to Mallet's suggestion **[Reply Br. at 6]**, we do not think that our holding creates a circuit split.

1    years after that.[7] Therefore, the motion to dismiss the Eighth Amendment claim as

2    time-barred was improperly granted.[8]

---

[7] On appeal, Mallet argues in the alternative that his complaint was timely even if the deliberate indifference claim had accrued more than three years earlier because (a) the court should have applied a seven-year statute of limitations; or, alternatively, (b) the Governor of New York tolled the three-year statute of limitations for personal injury claims during the COVID-19 pandemic, thus tolling the limitations period for Section 1983 claims as well. We decline to address these arguments here because they (a) were not raised below and (b) are not necessary to decide this appeal.

[8] The dissent is, of course, correct that knowledge of an objectively serious condition is needed for this suit to proceed. But everything in the dissent flows from two errors in its analysis.

The dissent first conflates two potentially serious conditions: chronic prostatitis and prostate cancer. While these conditions share some similar symptoms, the difference between chronic prostatitis and prostate cancer is not one of degree—"the full extent of the injury"—but of kind. *Wallace*, 549 U.S. at 391. As the dissent correctly notes, Mallet's complaint speaks only to cancer because that is the serious condition for which Mallet alleges he received constitutionally inadequate treatment. Mallet was certainly unhappy with his treatment when he believed he had some benign condition or infection that Flomax was not remedying. Whether Mallet could have also plausibly alleged that the Defendants-Appellees were deliberately indifferent in their treatment of Mallet's prostatitis, had he sued earlier, is irrelevant to this case. Instead, Mallet waited and brought *this* suit, alleging that the Defendants-Appellees were deliberately indifferent to his prostate cancer. He could not have brought such a suit until he himself knew or should have known about his prostate cancer. This does not mean "that Mallet's urinary symptoms were not symptoms of cancer," *post* at 19, but it does mean that those symptoms were insufficient to give Mallet, as a layperson, actual or constructive knowledge of his cancer.

The dissent's second mistake is that it assumes that believing that what was known by a medical professional must also have been known by an ordinary person. Mallet has made a plausible argument that the Defendants-Appellees knew of his prostate cancer when he, and a reasonable lay person like him, would not have. The dissent instead repeatedly argues that the Defendants-Appellees cannot possibly be held accountable for knowing about and failing to treat an objectively serious condition if Mallet himself did not know of the condition.

Our court and others have clearly indicated that a condition is objectively serious if a person *informed of the diagnosis* would consider it so. *E.g.*, *Brock*, 315 F.3d at 162 (indicating that, while "[t]here is no settled, precise metric" for a serious condition, one factor is "whether a reasonable *doctor or patient* would perceive the medical need in question as important and worthy of comment or treatment" (emphasis added) (citation omitted)); *Lumbard v. Lillywhite*, 815 F.

1    Defendants-Appellees suggest that our analysis runs afoul of the accrual

2    framework articulated in *Wallace v. Kato*. In that case, which concerned a Section

---

App'x 826, 832 (6th Cir. 2020) ("[W]e have looked not to what was obviously detectable to the eye but instead to whether a layman, made aware of an individual's actual medical condition, would consider the condition to be obviously medically serious. . . . [A] plaintiff need not know he is experiencing a serious medical condition for the condition to satisfy the objective component of deliberate indifference." (citations omitted)). And no court that we know of has held the contrary.

Indeed, we are unaware of any court that has held, for example, that the statute of limitations begins immediately for a person who experiences "chronic and substantial pain" and other symptoms, is told by their doctor that these are symptoms of a condition treatable by antibiotics, and finishes the course of antibiotics, only to then learn that their pain was actually a symptom of cancer that their doctor knew or should have known about, at the level of deliberate indifference, all along. Nor do we know of any court that would bar that plaintiff from alleging their doctor's awareness of their cancer simply because they had not recognized their own symptoms as cancer. Yet this would be the result of our adopting the rule urged by the dissent, incorporating these two errors into our caselaw. We decline to do so. None of our sister circuits have adopted the dissent's rule. *See, e.g.*, *Augustine v. United States*, 704 F.2d 1074, 1078 (9th Cir. 1983) (finding that when "the injury alleged by [a plaintiff] is not the bump on his palate but the development of the bump from a controllable medical condition into incurable metastatic cancer," the date of accrual is when the "plaintiff discovered or . . . should have discovered that the failure of his doctors to diagnose, treat, or warn him led to his deteriorating physical condition"); *Devbrow*, 705 F.3d at 769; *Lawson*, 726 F. App'x at 691. And lower courts have taken our reading for granted. *E.g.*, *Waters v. Geo Grp., Inc.*, No. 2:15-CV-00282, 2016 WL 4373717, at *5 (E.D. Va. Aug. 10, 2016) (beginning the statute of limitations, at the latest, when the plaintiff learned that the growth on his neck was malignant rather than when he learned about the growth); *Richards v. Pickett*, No. 5:18-CV-00912, 2018 WL 8731560, at *5 (C.D. Cal. Dec. 13, 2018) (beginning the statute of limitations when the plaintiff learned that his cancer had become terminal, not when he learned of the cancer, because that was the specific harm upon which his complaint was based); *McDonald v. Macabuhay*, No. 2:07-CV-01022, 2009 WL 2432833, at *6 (D. Ariz. Aug. 10, 2009) (rejecting as "circuitous logic" the defendant's argument that his imprisoned patient "had enough information to draw the inference that he was at risk [of harm from his Hepatitis], but . . . the physician treating him did not have enough information to draw that inference").

Everything else in the dissent flows from those two errors. For that reason, we believe that most of the dissent's discussion fails. As to the Defendants-Appellees' purported qualified immunity, the dissent's discussion is based on arguments on which the majority does not rule.

1983 false imprisonment claim, the Supreme Court applied the common law rule

that "the tort cause of action accrues . . . when the wrongful act or omission results

in damages," even if "the full extent of the injury is not then known or

predictable." *Wallace*, 549 U.S. at 391 (internal quotation marks omitted).

We disagree that our decision conflicts with this framework. The fact that

Mallet's urinary problems were later revealed to be symptoms of a different,

serious medical condition does not (merely) demonstrate the "full extent" of his

alleged injury; it is an essential element of his claim that Defendants-Appellees

were deliberately indifferent to his prostate cancer, without which Mallet could

not have alleged this "constitutionally cognizable" injury at all. *Chance*, 143 F.3d at

702; *see also, e.g.*, *Brock*, 315 F.3d at 163; *Collymore*, 74 F.4th at 30-31.

In other words, the moment when Mallet knew or should have known that

he possibly had prostate cancer is analogous to the moment when, in *Wallace v.

Kato*, Andre Wallace knew or should have known that he had been detained

without adequate legal process. By contrast, the moment when Mallet discovered

that the prison doctors' (alleged) indifference to his medical needs resulted in a

prostatectomy is analogous to the moment when Wallace discovered that the

confession he gave during his (allegedly) unlawful detention resulted in a false

murder conviction. The facts in the first pair are themselves needed to establish

the fundamental elements of the constitutional injuries alleged, while the facts in

the second pair simply go to the "full extent" of the "consequential damages"

inflicted by those injuries. *Wallace*, 549 U.S. at 391.

Indeed, and not surprisingly, after *Wallace v. Kato*, several of our sister

circuits have also found that an Eighth Amendment deliberate indifference claim

does not accrue until the plaintiff knew or should have known that the specific

condition that gave rise to his suit was sufficiently serious. *See Vasquez v. Davis*,

882 F.3d 1270, 1276 (10th Cir. 2018) (finding that "[t]he claim accrued once Vasquez

knew Defendants' deliberate indifference caused him *substantial harm*, even

though the full extent of the injury [wa]s not then known or predictable"

(emphasis added) (quoting *Wallace*, 549 U.S. at 391) (internal quotation marks

omitted)); *Devbrow*, 705 F.3d at 769 (holding that plaintiff's deliberate indifference

claim did not accrue until he learned he had late-stage cancer).

Therefore, our conclusion that Mallet's deliberate indifference claim did not

accrue until he either knew or had reason to know the facts which tended to

establish one of the essential elements of the claim that gave rise to his suit—that

he possibly had cancer, and that this was the serious medical condition that gave

rise to his claim under the Eighth Amendment—is consistent with the framework

articulated in *Wallace v. Kato*.

In *Wallace v. Kato*, of course, there was no factual dispute about when

Wallace knew or should have known that he had been unlawfully detained, so the

Court could resolve the timeliness of his false imprisonment claim as a matter of

law. But in the instant case, the moment at which Mallet knew or should have

known his serious medical condition was possibly cancer is a question of fact that

has not yet been determined and must *at this stage* be read in Mallet's favor.

**C. Plausibility of the Section 1983 Claims**

As an alternative basis for affirming, Defendants-Appellees argue that the

deliberate indifference claim should have been dismissed for failure to state a

plausible claim for relief.[9] They do not, of course, dispute that terminal prostate

cancer is an objectively serious medical condition. Rather, they argue that Mallet's

complaint does not allege sufficient facts to plausibly establish the *subjective*

---

[9] Although the district court did not reach the plausibility arguments below, we "may affirm on any basis for which there is sufficient support in the record, including grounds not relied on by the district court." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 413 (2d Cir. 2014) (quoting *Bruh v. Bessemer Venture Partners III L.P.*, 464 F.3d 202, 205 (2d Cir. 2006)). We will do so in the instant case, in the interest of judicial economy, but only as to those claims for which further consideration by the district court would not be helpful.

1   component of the deliberate indifference claim, *i.e.*, that Defendants-Appellees

2   consciously disregarded substantial risks to Mallet's health by failing to conduct

3   the appropriate screening tests. In their view, Mallet alleges nothing more than a

4   "mere disagreement over the proper treatment" for his symptoms, which might

5   be enough for a malpractice claim but falls short of an Eighth Amendment

6   violation. *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011); *accord Harrison v. Barkley*,

7   219 F.3d 132, 139 (2d Cir. 2000).

8      With respect to Dr. Makram and Dr. Stellato, we disagree. According to

9   Mallet's complaint, "officers and nurses would call [him] scum for continuing to

10  ask for medical treatment," "question [Mallet's] repeated sick call requests," and,

11  in fact, told him that "he would only get the minimum treatment the State will

12  allow at the behest of [Dr. Makram]." J. App'x at 13. If we accept, as we must, that

13  these statements were made, and we reasonably infer that the statements were

14  based on prison staff's personal knowledge, then it is certainly plausible that Dr.

15  Makram "consciously cho[se] an easier and less efficacious treatment plan" for

16  Mallet's symptoms—a standard theory of Eighth Amendment deliberate

17  indifference. *Chance*, 143 F.3d at 703 (citing *Williams v. Vincent*, 508 F.2d 541, 544

18  (2d Cir. 1974)).

1    Dr. Stellato, for his part, is a urologist. Thus, a reasonable factfinder could

2    infer from the complaint that he had "actual knowledge" of the risk that Mallet

3    might have prostate cancer—given the abnormal cystoscopy results—and,

4    therefore, that his subsequent decision not to conduct a PSA test evinced

5    "deliberate indifference toward that risk." *Chance*, 143 F.3d at 703; *see, e.g., Hart v.*

6    *Blanchette*, 149 F. App'x 45, 47 (2d Cir. 2005) (reversing summary judgment on a

7    deliberate indifference claim where "the determination of the difference between

8    negligence and deliberate indifference is . . . one for a trier of fact to make."). For

9    these reasons, we hold that the Eighth Amendment claims against Dr. Makram

10   and Dr. Stellato are sufficiently plausible to survive the pleading stage.

11   As for Professor Ritaccio, however, we hold that Mallet does *not* state a

12   plausible deliberate indifference claim. Even assuming that Professor Ritaccio

13   should be considered a state actor,[10] it cannot be said that he was aware of and

14   "consciously disregarded" the substantial risks to Mallet's health. As Mallet

15   alleges in his complaint, Professor Ritaccio examined him and noted his symptoms

16   of urinary retention and bladder dysfunction. Professor Ritaccio further noted

---

[10] Neither party has addressed this issue.

1   that, in light of Mallet's symptoms, he was unsure why Mallet was referred to him

2   for "a neuro evaluation." J. App'x at 15. Professor Ritaccio also noted that he is

3   "not a neurologist" and he does not "have a differential for this." *Id.* Despite not

4   being Mallet's primary care provider or a urologist, Professor Ritaccio examined

5   Mallet and made the above-mentioned notes for Dr. Makram to review. Under

6   these circumstances, it is unreasonable to infer that Professor Ritaccio would have

7   immediately recognized the hallmark symptoms of prostate cancer or that he

8   would have been able to recommend an appropriate treatment plan for Mallet.

9   Therefore, we affirm the dismissal of the deliberate indifference claim against

10  Professor Ritaccio on the alternative basis that the complaint failed to state a

11  plausible claim for relief against him.

12  **D. Sovereign Immunity**

13          We also affirm the dismissal of all seven Section 1983 claims against the State

14  of New York, DOCCS, and Annucci acting in his official capacity as commissioner

15  of DOCCS, as the Supreme Court has held that Section 1983 does not abrogate

16  sovereign immunity. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989);

17  *Horne v. Coughlin*, 191 F.3d 244, 246 (2d Cir. 1999); *see also Al-Jundi v. Estate of*

18  *Rockefeller*, 885 F.2d 1060, 1065 (2d Cir. 1989) ("[A] Section 1983 claim for damages

1    against a state official can only be asserted against that official in his or her

2    *individual* capacity." (emphasis added)).[11]

3    **E. The Remaining Claims**

4          In light of our holdings that Mallet's case is not, as a matter of law, barred

5    by the statute of limitations and that his deliberate indifference claims against Dr.

6    Makram and Dr. Stellato are plausible enough to be reinstated, we also vacate the

7    district court's order declining to exercise supplemental jurisdiction over the

8    common law medical malpractice and negligence claims. Additionally, because

9    the district court did not individually assess the plausibility of the six remaining

10   constitutional claims against Dr. Makram, Dr. Stellato, and Professor Ritaccio, we

11   vacate the dismissal of those claims as well, without expressing any opinion on

12   their plausibility.

---

[11] Defendants-Appellees also argue that Dr. Stellato, Dr. Makram, and Professor Ritaccio are entitled to qualified immunity on the constitutional claims. Given that the district court did not reach this issue, we decline to resolve it here. We thus remand to the district court to evaluate whether these defendants are entitled to qualified immunity, bearing in mind that there does not need to be Second Circuit caselaw explicitly holding that a particular condition is sufficiently serious to find that "[t]he right to be free from such a condition is clearly established." *Collymore*, 74 F.4th at 31 (finding it plausible that the right to be free from deliberate indifference to a scalp condition which caused "chronic and substantial pain" had been clearly established, despite an "absence of precedents involving scalp infection").

In sum, we REVERSE the district court's dismissal of the deliberate

indifference claims against Dr. Makram and Dr. Stellato; we AFFIRM the dismissal

of the deliberate indifference claim against Professor Ritaccio and the dismissal of

all seven constitutional claims against New York State, DOCCS, and Annucci

acting in his official capacity; and we VACATE the dismissal of the other six

constitutional claims against Dr. Makram, Dr. Stellato, and Professor Ritaccio as

well as the dismissal of the state common law medical malpractice and negligence

claims against all eight defendants.

## CONCLUSION

For the foregoing reasons, the judgment of the District Court is **AFFIRMED**

in part, **REVERSED** in part, and **VACATED** in part, and the case is **REMANDED**

for further proceedings consistent with this opinion.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

29