UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____ x

ANTONIO MALLET,

                Plaintiff,

                                              22-cv-1604 (CM)

    -against-

MERVAT MAKRAM, MD, and THOMAS
VITO STELLATO, M.D.,

                Defendants.

_____ x

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This case returns to this Court after the Second Circuit affirmed in part, reversed in part, and vacated in part this Court's dismissal of Plaintiff Antonio Mallet's claims. Now before the Court is Defendants' motion for summary judgment.

Mallet, who was incarcerated in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") from 1999 until January 2019, alleges that prison medical providers failed to diagnose and treat prostate cancer while he was incarcerated at Woodbourne Correctional Facility ("Woodbourne"). The remaining defendants are Dr. Mervat Makram, the Facility Health Services Director at Woodbourne, and Dr. Thomas Vito Stellato, a urologist who saw Mallet as an outside consultant for the DOCCS.

At this stage, the question is whether the record would permit a jury to find that Dr. Makram and Dr. Stellato consciously disregarded a serious risk that Mallet's persistent urinary symptoms reflected prostate cancer. Mallet contends that his persistent urinary obstruction, his lack of meaningful, positive response to Flomax, the results of a September 2017 cystoscopy, the absence of timely prostate-cancer testing, and a later prostate-specific antigen ("PSA") result of 3.60 in

October 2018 together created an obvious risk that he had prostate cancer – a risk that defendants knew about and consciously disregarded.  Defendants respond that Mallet had a long history of urinary and bladder dysfunction, that his symptoms were reasonably attributed to benign prostatic hyperplasia ("BPH"), bladder dysfunction, or neurological causes, that testing available at the time did not suggest cancer, and that no cancer was diagnosed until 2021, long after Mallet left DOCCS custody.

Where Dr. Makram is concerned, the Court cannot choose between the parties' competing accounts as a matter of law.  *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997) ("Credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.").  There is evidence from which a jury could find that Dr. Makram treated Mallet's symptoms as a benign urinary problem and failed to pursue cancer-related testing despite facts that, when viewed in Mallet's favor, called for additional medical inquiry.  There is also evidence from which a jury could credit Defendants' view that Dr. Makram pursued a reasonable course of treatment for a chronic urinary condition and that, at most, this case sounds in malpractice, which does not rise to the level of deliberate indifference.  Resolving these competing inferences is the province of a jury.

The conclusion is different as to Dr. Stellato.  His involvement in Plaintiff's care was limited to the 2017 urology evaluation and cystoscopy; there is no evidence that he saw the later October 2018 PSA result.  The § 1983 deliberate indifference claim can be and is summarily dismissed as against him.

The limitations issue likewise cannot be decided in Defendants' favor on this record.  The Second Circuit has already held that "the injury for which Mallet seeks relief is cancer," and that "the relevant question is when he knew or should have reasonably known that he had prostate

cancer." *Mallet v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 126 F.4th 125, 129 (2d Cir. 2025).  Discovery has not eliminated the factual dispute over when Mallet knew or reasonably should have known that the urinary symptoms he experienced in prison were symptoms of prostate cancer, rather than the non-cancerous urinary condition he says Defendants told him he had.

Accordingly, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.

The motion is DENIED as to Mallet's Eighth Amendment deliberate-indifference claim against Dr. Makram.  It is also DENIED as to Dr. Makram's statute-of-limitations and qualified-immunity defenses to that claim.

The motion is GRANTED as to Mallet's Eighth Amendment deliberate-indifference claim against Dr. Stellato and that claim is dismissed with prejudice.

The motion is GRANTED as to Mallet's remaining Section 1983 claims and theories, including his Fifth and Fourteenth Amendment theories, retaliation, failure to intervene, supervisory liability, and Section 1983 conspiracy.

Mallet's state-law malpractice and negligence claims against Dr. Makram are DISMISSED for lack of jurisdiction pursuant to New York Correction Law § 24.  This dismissal is without prejudice to Mallet's assertion of his state and common law claims against the State of New York in the New York Court of Claims.

Mallet's ordinary negligence claim against Dr. Stellato is DISMISSED but the doctor's motion for summary judgment dismissing the medical malpractice claim against him is DENIED.

The case will proceed to trial against Dr. Makram on the Eighth Amendment deliberate-indifference claim and against Dr. Stellato on the state-law medical-malpractice claim.

## I.    FACTUAL BACKGROUND

### A.  The Parties and Plaintiff's Medical Issues

Antonio Mallet was incarcerated in DOCCS custody from 1999 until January 2019.  He was housed at Woodbourne Correctional Facility from approximately April 2017 until November 2018, when he was transferred to Queensboro Correctional Facility shortly before his release.  Dkt. No. 75, ¶¶ 1–4.

Dr. Mervat Makram was the Facility Health Services Director at Woodbourne during the relevant period.  Dkt. No. 75, ¶ 9.  Defendants characterize her role as primarily supervisory and administrative – approving and forwarding referrals to outside specialists and reviewing outside consults as needed.  Dkt. No. 67, ¶¶ 9–14.  Mallet disputes that characterization.  He contends that Dr. Makram was the final medical decisionmaker at Woodbourne, oversaw all medical providers and nursing staff, reviewed his chart, and had authority to order tests and specialist referrals, including PSA testing and urology referrals.  Dkt. No. 75, ¶¶ 10, 13, 117–25, 139.

Dr. Thomas Vito Stellato is a urologist who saw Mallet in 2017 as an outside consultant for DOCCS.  Dkt. No. 75, ¶¶ 15–16, 164–66.  A urologist is a physician who treats conditions involving the urinary tract and male reproductive organs, including the prostate.

The record uses several medical terms that are helpful to define at the outset.  A PSA test is a blood test that measures prostate-specific antigen, a protein associated with the prostate.  A PSA result is not itself a cancer diagnosis; PSA can rise for reasons other than cancer.  But an elevated PSA, or a meaningful increase in PSA over time, can prompt further evaluation for prostate cancer.  A DRE, or digital rectal examination, is a physical examination in which a clinician feels the prostate through the rectum; it does not allow visual inspection of the prostate.  Dkt. No. 75, ¶ 167.  A cystoscopy is a procedure in which a scope is used to look inside the bladder and urinary tract; it can help evaluate urinary obstruction, but the parties agree that a cystoscopy

cannot confirm or rule out prostate cancer.  Dkt. No. 75, ¶ 172.  A biopsy, on the other hand, involves taking tissue samples for testing and is the way prostate cancer is confirmed.  Dkt. No. 75, ¶¶ 170, 175, 182–83.  Flomax is a medication used to improve urinary flow in patients with urinary symptoms, often associated with benign prostate enlargement; it does not treat prostate cancer.

### B.  Mallet's Pre-Woodbourne Urinary History

The parties agree that Mallet had urinary and bladder complaints before he arrived at Woodbourne, but they dispute how far back those complaints went and what they signified. Defendants contend that Mallet had a long history of urinary and bladder dysfunction dating back many years, possibly to his twenties.  Dkt. No. 67, ¶ 6–7.  Mallet disputes that characterization and testified that his urinary problems began in approximately 2010 or 2011, after he was already incarcerated.  Dkt. No. 75, ¶¶ 6–7, 71–82.

The medical records include an April 2011 PSA value of 1.77.  Dkt. No. 76-7 at 12–14. That value was well below the laboratory reference cutoff of 4.00.  The parties later disagree about the significance of a handwritten notation of a PSA value of 2.2 in the 2017 urology records. Plaintiff emphasizes that no standalone lab report for a 2.2 PSA result appears in the produced medical records, while a lab report exists for the 2011 PSA value.  Dkt. No. 75, ¶¶ 156, 158–59, 207–10.  Defendants respond that the 2.2 value was noted in the medical chart and was within normal limits.  Dkt. No. 65, ¶¶ 19, 27.

In January 2017, before Mallet was transferred to Woodbourne, a urologist, Dr. George Owens, performed urodynamic testing.  Urodynamic testing evaluates how the bladder stores and releases urine.  Defendants state that the testing showed a large-capacity bladder with a post-void residual of 316 cubic centimeters ("cc"); "post-void residual" refers to the amount of urine left in

the bladder after urination, and Defendants state that normal is less than 100 ccs.  Dkt. No. 67, ¶ 17.  Dr. Owens recommended neurological evaluation and a follow-up cystoscopy.  Dkt. No. 67, ¶¶ 18–19; *see also* Dkt. No. 66-3, Ex. C.

### C.  Mallet Arrives at Woodbourne and Is Referred to Urology

Mallet arrived at Woodbourne in April 2017.  Defendants contend that, upon arrival, Woodbourne medical staff continued Mallet's Flomax prescription and rescheduled a urology consult that had been recommended before his transfer.  Dkt. No. 65, ¶¶ 15–18, 21–25.  Mallet contends that his urinary symptoms were worsening, that Flomax was not working, and that Dr. Makram and Woodbourne medical staff failed to treat his complaints with appropriate urgency. Dkt. No. 75, ¶¶ 78, 81–82, 126–38.

On May 19, 2017, Dr. Makram approved a referral to Dr. Stellato, a urologist.  Dkt. No. 75, ¶ 14.  Mallet first saw Dr. Stellato on July 11, 2017, for urinary and bladder dysfunction.  Dkt. No. 75, ¶ 16.  At that visit, Dr. Stellato performed a physical examination, including a DRE.  Dkt. No. 67, ¶ 21.  He noted that Mallet complained of incomplete emptying of the bladder and that Mallet's prostate was mildly enlarged, with no nodules or induration.  Dkt. No. 67, ¶¶ 22–25.

Dr. Stellato did not order a PSA test at that visit.  Dkt. No. 75, ¶ 177.  He testified that a prior PSA value of 2.2 was noted, but he did not know the date of that test and believed it was recent enough.  Dkt. No. 75, ¶ 178.  Plaintiff contends that the last documented PSA lab report in the record was from 2011, six years earlier.  Dkt. No. 75, ¶ 179.

### D.  The September 2017 Cystoscopy and Continued Symptoms

On September 7, 2017, Dr. Stellato performed a cystoscopy.  Dkt. No. 66-2 at 1–3.  It confirmed that Mallet was not emptying his bladder and showed mild congestion of the prostatic lobe, posterior urethra, and bladder neck.  *Id.*; Dkt. No. 75, ¶ 37.  The report also noted bladder

trabeculation.  Dkt. No. 66-2 at 1.  "Trabeculation" refers to thickening or ridging of the bladder wall, often associated with chronic difficulty emptying the bladder.

The parties draw different conclusions from that September 2017 cystoscopy.  Defendants emphasize that Dr. Stellato found no tumor, no significant outlet obstruction, no nodules or induration on the prior DRE, and no cancer cells on urine cytology.  Dkt. No. 67, ¶¶ 23–29, 36–41; Dkt. No. 65, ¶¶ 26–27, 33.  Urine cytology examines urine for abnormal cells; a negative bladder cytology result is favorable to Defendants, but it is not the same thing as a prostate biopsy and does not rule out prostate cancer.

Mallet emphasizes different facts.  The parties agree that a cystoscopy cannot confirm or rule out prostate cancer and that early-stage prostate cancer would not be seen during a cystoscopy. Dkt. No. 75, ¶¶ 172, 174; Dkt. No. 76-3, Stellato Dep., 15:7–10, 18:13–20.  Mallet also points to Dr. Stellato's testimony that a poor response to Flomax – a medication used to improve urinary flow – can be something a physician would consider in evaluating possible prostate cancer, and that a biopsy is needed to diagnose prostate cancer.  Dkt. No. 75, ¶¶ 169–75; Dkt. No. 76-3, Stellato Dep., 12:25–13:18, 18:13–20.  After Mallet's cystoscopy, Dr. Stellato did not order a PSA test or biopsy.  Dkt. No. 75, ¶¶ 177, 185.  He recommended continued Flomax, antibiotics, and a neurological evaluation.  Dkt. No. 65, ¶¶ 27–28; Dkt. No. 66-2 at 2.  Defendants contend that this was medically reasonable because the findings suggested BPH – a noncancerous enlargement of the prostate gland – bladder dysfunction, or a possible neurological component.  Dkt. No. 67, ¶¶ 30–35, 39–41, 49.  Mallet, however, contends that the neurological referral diverted attention away from an unresolved urological problem and that neither defendant took adequate steps to rule out prostate cancer.

Mallet continued to complain of urinary problems after the cystoscopy. The Second Circuit, describing the allegations at the pleading stage, noted that Mallet complained of urinary dysfunction on October 12, 2017; complained of abdominal pain and blood in the toilet on October 20, 2017; and later reported urinary retention on three separate occasions – in November 2017, March 2018, and September 2018. *Mallet*, 126 F.4th at 130.

Dr. Stellato's recommendation that Mallet receive a neurological evaluation is also part of the parties' factual dispute. Defendants state that a neurological consultation was entered after Dr. Stellato's recommendation, that an MRI of the brain was ordered, and that multiple sclerosis was conclusively ruled out. Dkt. No. 65, ¶ 28. Mallet contends that once the foregoing neurological causes were not shown to explain his urinary problems, the need for a renewed urological evaluation was even stronger. Dkt. No. 75, ¶¶ 213–14.

The parties also sharply dispute how seriously Dr. Makram took Mallet's continued complaints. Plaintiff points to testimony that, according to him, shows Dr. Makram believed his urinary complaints were mere excuses to avoid prison programs, classes, trips, or bus transportation. Dkt. No. 75, ¶¶ 145–51.

### E. The October 2018 PSA Result and Transfer to Queensboro

On October 4, 2018, Mallet had a PSA test that returned a value of 3.60. Dkt. No. 76-7 at 10–11. PSA, or prostate-specific antigen, is a protein associated with the prostate; a PSA blood test is not itself a cancer diagnosis, but it can be used to assess whether further prostate evaluation is warranted. The laboratory reference range listed values under 4.00 as within range. But Mallet argues that the increase from prior PSA values – including the 2011 PSA of 1.77 and the disputed 2017 notation of 2.2 – was medically significant and should have triggered repeat PSA testing or urology referral.

- 8 -

Dr. Makram did not refer Mallet to a urologist after the October 2018 PSA result.  Dkt. No. 75, ¶ 155.  Plaintiff points to Dr. Stellato's testimony that, had he seen a patient with a PSA increase from 2.2 to 3.6 in approximately a year, he would have explored it further and repeated the PSA test.  Dkt. No. 75, ¶¶ 186–87; *see also* Dkt. No. 76-3, Stellato Dep., 39:21–40:25 ("Q: Sure. But you agree with me that an increase from 2.2 to 3.6 is medically significant? A: I – it can be, yes. . . .   A: And it would be enough that I would repeat it.  Yes. . . . A: I would not ignore it.").

In November 2018, Mallet was transferred from Woodbourne to Queensboro.  The transfer records are significant for two reasons.

*First,* Plaintiff contends that the final Woodbourne medical problem list, dated November 7, 2018, identified only genital herpes and an "occupational problem," and failed to list any urinary-retention, bladder-emptying, urological, or prostate condition.  Dkt. No. 75, ¶¶ 227–30; Dkt. No. 76-7 at 1–3.

*Second,* Plaintiff contends that the November 2, 2018 transfer form prepared for his move to Queensboro – which Plaintiff attributes to the nurse administrator and Dr. Makram – did not mention the September 2017 cystoscopy, the October 4, 2018 PSA result of 3.60, his Flomax prescription, or any need for urological follow-up.  Dkt. No. 75, ¶¶ 233–40, 249; Dkt. No. 76-7 at 7.  These alleged omissions are legally significant, Plaintiff says, because they occurred shortly after two further urinary complaints: a September 14, 2018 complaint that he had a "weak bladder" and was getting up to urinate several times at night despite no change in water intake, and another September 28, 2018 complaint of a bladder issue.  Dkt. No. 75, ¶¶ 240–41; Dkt. No. 76-7 at 8–9.  Defendants dispute the significance of these omissions.  They maintain that Mallet's symptoms were indicative of BPH or dysfunctional bladder, not prostate cancer; that he had no symptoms or

findings of prostate cancer while incarcerated; and that there were no indications of cancer when he was transferred from Woodbourne to Queensboro. Dkt. No. 67, ¶¶ 49, 52; Dkt. No. 68 at 5–6.

### F. Release, Post-Release Testing, and Cancer Diagnosis

Mallet was released from DOCCS custody on January 16, 2019. Dkt. No. 75, ¶ 4. Defendants contend that he was given instructions to follow up with a primary care provider, his medications, prescriptions, and assistance with Medicaid enrollment. Dkt. No. 65, ¶ 35. Mallet responds that he was released to parole supervision and to Bellevue Hospital shelter, where he lived for approximately two years; he further testified that, after leaving the shelter, he was essentially "couch surfing," living wherever he could find a place to stay. Dkt. No. 75, ¶¶ 59–60; Dkt. No. 76-1, Mallet Dep., 21:21–22:25.

Mallet's post-release medical records show that the urinary and prostate concerns eventually led to renewed PSA testing. In August 2020, Mallet had a PSA result of 8.43. Dkt. No. 76-5 at 10–12. Subsequent PSA results remained elevated: 6.49 in October 2020 and 6.37 in February 2021. Dkt. No. 76-5, at 10–12. Those elevated results led to a biopsy. On April 6, 2021, Mallet underwent a transrectal prostate biopsy at Woodhull Hospital for elevated PSA. Dkt. No. 76-5 at 9–10. The Woodhull records reflect that the biopsy confirmed adenocarcinoma of the prostate. Dkt. No. 75, ¶¶ 215–17; Dkt. No. 76-5 at 8–14. Adenocarcinoma is a cancer arising from glandular tissue. Most prostate cancers are adenocarcinomas.

After the biopsy, Mallet sought further evaluation at Kings County Hospital. In May 2021, Kings County confirmed the prostate-cancer diagnosis and staged the cancer at a Gleason score of 9. Dkt. No. 75, ¶¶ 221–22; Dkt. No. 76-6 at 1–3. The Gleason score is a grading system for prostate cancer; it ranges from 1–10, and the higher the score, the more aggressive the cancer appears under a microscope.

The following month, Mallet presented to Kings County for surgery by Dr. Bethany Desroches and underwent a robotic-assisted radical prostatectomy – that is, surgical removal of the prostate – with bilateral lymph-node dissection. Dkt. No. 75, ¶¶ 223–25; Dkt. No. 76-6 at 6. He was discharged home after receiving Foley-catheter teaching. A Foley catheter is a tube used to drain urine from the bladder. Dkt. No. 75, ¶ 225; Dkt. No. 76-6 at 6.

Mallet testified that he continues to suffer serious complications from the cancer and surgery, including urinary incontinence and sexual dysfunction. Dkt. No. 75, ¶¶ 66–70; Dkt. No. 76-1, Mallet Dep., 33:17–40:23.

## II. PROCEDURAL HISTORY

Mallet filed this action on February 25, 2022, and filed an amended complaint on June 30, 2022. Dkt. Nos. 1, 36. The amended complaint named as defendants the State of New York; the New York State Department of Corrections and Community Supervision ("DOCCS"); Anthony J. Annucci, then the Acting Commissioner of DOCCS, in his official capacity; Dr. Mervat Makram, the Woodbourne medical director; Dr. Thomas Vito Stellato, the outside urologist who performed Mallet's September 2017 cystoscopy; Anthony L. Ritaccio, the provider to whom Mallet was referred for a neurological evaluation after the cystoscopy; and various John and Jane Doe correctional and medical personnel. Dkt. No. 36, ¶¶ 10–18, 156–62.

The amended complaint asserted seven constitutional claims under 42 U.S.C. § 1983: (1) deliberate indifference to a serious medical condition in violation of the Eighth Amendment; (2) denial of medical care in violation of the Fourteenth Amendment; (3) retaliation; (4) other violations of the Fifth, Eighth, and Fourteenth Amendments; (5) failure to intervene in constitutional rights violations; (6) supervisory liability for constitutional rights violations; and (7)

conspiracy to violate constitutional rights. Dkt. No. 36, ¶¶ 76–154. It also asserted two New York state-law claims: medical malpractice and negligence. *Id.*, ¶¶ 155–179.

Defendants moved to dismiss the amended complaint pursuant to Rules 12(b)(1) and 12(b)(6). Dkt. No. 39. They argued that the constitutional claims were time-barred; that the constitutional claims were not plausibly pleaded; that the individual defendants were entitled to qualified immunity; that the state defendants were entitled to sovereign immunity; that the state-law claims against the individual defendants could not be brought in federal court under New York law; and that, if the constitutional claims were dismissed, the Court should decline to exercise supplemental jurisdiction over the state-law claims. Dkt. No. 40.

On October 24, 2022, this Court granted defendants' motion to dismiss. *Mallet v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 22 Civ. 1604 (CM), 2022 WL 14092499, at *6 (S.D.N.Y. Oct. 24, 2022). The Court held that Mallet's § 1983 claims accrued no later than January 16, 2019 – the date he was released from DOCCS custody – and that the claims were therefore barred by New York's three-year limitations period for § 1983 claims. *Id.* at *4–6. Having dismissed all federal claims, the Court declined to exercise supplemental jurisdiction over the state-law claims and dismissed those claims without prejudice. *Id.* at *6.

The Second Circuit affirmed in part, reversed in part, and vacated in part. *Mallet*, 126 F.4th at 139. The Circuit held that, because "the injury for which Mallet seeks relief is cancer," the "relevant question is when he knew or should have reasonably known that he had prostate cancer." *Id.* at 129. It further held that "the moment at which Mallet knew or should have known his serious medical condition was possibly cancer is a question of fact," and that, at the pleading stage, it was plausible that Mallet's deliberate-indifference claim had not accrued by February 25, 2019 – three years before he filed this action. *Id.* at 129, 134–35.

As to the merits of the Eighth Amendment deliberate-indifference claim, the Second Circuit reversed this Court's dismissal of that claim against Dr. Makram and Dr. Stellato. *Id.* at 137, 139. The Circuit held that, accepting the allegations as true, it was plausible that Dr. Makram "consciously cho[se] an easier and less efficacious treatment plan" for Mallet's symptoms, and that a reasonable factfinder could infer that Dr. Stellato, a urologist, had actual knowledge of the risk that Mallet might have prostate cancer in light of the cystoscopy results and nonetheless did not conduct PSA testing. *Id.* at 137 (citation omitted).

The Circuit, however, reached a different conclusion as to Ritaccio. As alleged in the Amended Complaint, Ritaccio was a professor of medicine specializing in neurology, who was asked to conduct a neurological evaluation after Dr. Stellato's recommendation. Dkt. No. 36, ¶ 161. The Second Circuit affirmed this Court's dismissal of the Eighth Amendment deliberate-indifference claim against Ritaccio, holding that the amended complaint did not plausibly allege that Ritaccio was aware of and consciously disregarded a substantial risk to Mallet's health. *Id.* at 138. It also affirmed dismissal of all seven § 1983 claims against New York State, DOCCS, and Annucci – who was sued only in his official capacity as DOCCS's Acting Commissioner – on sovereign-immunity grounds. *Id.* at 138–39.

The Circuit did not decide the viability of Mallet's other six constitutional claims against the individual defendants. *Id.* at 138. Because this Court had dismissed those claims as untimely without separately assessing their plausibility, the Second Circuit vacated their dismissal "without expressing any opinion on their plausibility." *Id.* It also vacated this Court's dismissal of the state-law medical malpractice and negligence claims. *Id.* Finally, because this Court had not reached qualified immunity, the Circuit declined to decide that issue and remanded for this Court to evaluate it in the first instance. *Id.* at 138 n.11.

Following remand, discovery was reopened.   On March 7, 2025, this Court permitted discovery from Mallet's parallel New York Court of Claims action to be used in this case and set September 30, 2025 as the deadline for completion of all discovery, including expert discovery.

Dr. Makram and Dr. Stellato then moved for summary judgment.   Dkt. No. 64.   Their motion seeks dismissal of all remaining claims against them, arguing principally that the evidence fails to establish deliberate indifference; that the constitutional claims are time-barred; that New York Correction Law § 24 bars the state-law claims; that both defendants are entitled to qualified immunity; and that the remaining constitutional theories fail as a matter of law.   Dkt. No. 68 at 7–24.

Mallet opposes summary judgment.   Dkt. No. 74.   He argues that the record contains triable issues of fact as to whether Dr. Makram and Dr. Stellato consciously disregarded the risk that his symptoms reflected prostate cancer; that the statute of limitations did not begin to run until he knew or reasonably should have known that he had prostate cancer and that defendants' treatment may have delayed diagnosis; and that disputed material facts preclude qualified immunity.   *Id.* at 16–25.

Mallet also submitted an expert affidavit from Dr. Jeffrey Branch, a urologist.   Dkt. No. 76-4.   Defendants moved to strike that affidavit and to preclude Dr. Branch from testifying, arguing that Mallet failed to comply with Rule 26(a)(2) and that expert discovery had already closed.   Dkt. Nos. 77, 79.   Plaintiff, for his part, moved to strike Defendants' reply counterstatement to Plaintiff's additional Rule 56.1 facts, arguing that Local Civil Rule 56.1 does not authorize such a submission.   Dkt. No. 84; *see* Dkt. No. 82.   Both motions are addressed below.   Plaintiff's motion to strike Defendants' reply counterstatement is denied; Defendants' motion to strike Dr. Branch's

affidavit and preclude him from testifying is denied, subject to the limited expert-discovery relief described below.

On December 8, 2025, the parties filed a stipulation voluntarily dismissing all claims against Ritaccio with prejudice, without fees or costs. Dkt. No. 89. Accordingly, no claims remain against New York State, DOCCS, Annucci, or Ritaccio. The only defendants now before the Court are Dr. Makram and Dr. Stellato.

The claims now before the Court are the claims against Dr. Makram and Dr. Stellato that survived or were reinstated after appeal: (1) the Eighth Amendment deliberate-indifference claim; (2) the remaining Section 1983 claims and theories for denial of medical care under the Fourteenth Amendment, retaliation, other Fifth/Eighth/Fourteenth Amendment civil-rights violations, failure to intervene, supervisory liability, and § 1983 conspiracy; and (3) the state-law claims for medical malpractice and negligence.

## III.    LEGAL STANDARD

Rule 56(a) provides that a party may move for summary judgment by "identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought," and that "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Summary judgment therefore turns on whether the record presents "a sufficient

disagreement to require submission to a jury" or is instead "so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

The moving party bears the initial burden of identifying the basis for its motion and the portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). But if the nonmoving party bears the burden of proof at trial, the movant need not "support its motion with affidavits or other similar materials negating the opponent's claim." *Id.* Rather, the moving party may discharge its burden by pointing out "an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has carried its burden, the nonmoving party must come forward with evidence showing that there is a genuine dispute for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. Instead, it must point to evidence from which a reasonable jury could return a verdict in its favor. *Anderson*, 477 U.S. at 248. In assessing whether that showing has been made, the Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Matsushita Elec. Indus.*, 475 U.S. at 587.

## IV.    DISCUSSION

### A. Motions to Strike

1.  Plaintiff's Motion to Strike Defendants' Rule 56.1 Counterstatement

Plaintiff moves to strike Defendants' "Counterstatement to Plaintiff's Statement of Additional Material Facts." Dkt. No. 84. The motion is DENIED.

Defendants filed their Local Rule 56.1 statement in support of summary judgment. Dkt. No. 67. Plaintiff then filed a responsive Rule 56.1 statement, which responded to Defendants' 55

numbered paragraphs and added 220 additional factual assertions that Plaintiff contends are material to the motion. Dkt. No. 75. Defendants thereafter filed a separate 57-page document responding to those additional factual assertions. Dkt. No. 82. Plaintiff argues that this filing is an unauthorized reply Rule 56.1 statement.

Local Rule 56.1 does not authorize Defendants' filing. The Rule provides that papers opposing summary judgment must include a response to the movant's Rule 56.1 statement and may include, "if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Civ. R. 56.1(b). It does not provide for a further Rule 56.1 reply by the moving party. *See Cap. Recs., LLC v. Vimeo, LLC*, 2018 WL 4659475, at *1 (S.D.N.Y. Sept. 7, 2018) ("Local Civil Rule 56.1 does not provide for a 'reply' in further support of a Rule 56.1 statement of undisputed facts."). Courts in this District have therefore described such filings as "a procedurally improper attempt to have the last word in a manner that is not contemplated by the local rules." *G.S. v. Pleasantville Union Free Sch. Dist.*, 2020 WL 4586895, at *1 n.2 (S.D.N.Y. Aug. 10, 2020) (citation omitted).

That is what Defendants' filing is. Defendants had an opportunity to file their Rule 56.1 statement, and they had an opportunity to reply in further support of their motion for summary judgment. Dkt. Nos. 67, 81. Their additional Rule 56.1 response gives them a further opportunity to characterize, qualify, and object to Plaintiff's factual presentation. Local Rule 56.1 is designed "to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties," not to generate another round of factual briefing. *Thompson v. Spota*, 2018 WL 6163301, at *16 (E.D.N.Y. Aug.

23, 2018), *report and recommendation adopted*, 2018 WL 4771901 (E.D.N.Y. Sept. 30, 2018) (citation omitted).

Defendants' concern that Plaintiff's additional factual assertions might otherwise be deemed admitted is well taken. Local Rule 56.1 permits the party opposing summary judgment to include, "if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Civ. R. 56.1(b). Plaintiff's submission added 220 additional factual assertions. Whatever else may be said about that submission, 220 additional assertions are not obviously "short and concise."

In ordinary circumstances, a reply Rule 56.1 statement is not contemplated by the Local Rules. *See Cap. Recs., LLC v. Vimeo, LLC*, 2018 WL 4659475, at *1 (S.D.N.Y. Sept. 7, 2018). But Plaintiff's unusually lengthy statement of additional facts substantially expanded the factual presentation beyond a conventional response to Defendants' Rule 56.1 statement. Under those circumstances, it would be unfair to strike Defendants' response while leaving Plaintiff's 220 additional assertions unanswered and potentially deemed admitted.

The better course is to consider Defendants' counterstatement for the limited purpose of identifying which of Plaintiff's additional factual assertions are disputed and what record evidence Defendants cite in response. The Court will not, however, treat either side's Rule 56.1 statement as evidence. Nor will the Court accept any factual assertion simply because it appears in a numbered paragraph. Rule 56.1 statements themselves are not evidence, and the Court will disregard those portions of any Rule 56.1 submission "that contain conclusory, argumentative, irrelevant, speculative, or unsupported assertions." *Dikambi v. City Univ. of New York*, 690 F. Supp. 3d 293, 301 (S.D.N.Y. 2023).

Accordingly, Plaintiff's motion to strike Defendants' Rule 56.1 counterstatement is DENIED.  The Court has considered Defendants' response to Plaintiff's additional Rule 56.1 assertions only to the extent it identifies genuine disputes and cites admissible record evidence.

2.  <u>Defendants' Motion to Strike Dr. Branch's Expert Affidavit and Preclude Him From Testifying</u>

Defendants move to strike the affidavit of Plaintiff's proposed urology expert, Dr. Jeffrey Branch, and to preclude Plaintiff from using Dr. Branch as an expert witness at trial.  Dkt. No. 77. The motion is DENIED.

Rule 26(a)(2)(A) requires a party to "disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705."  Fed. R. Civ. P. 26(a)(2)(A).  For a retained expert, the disclosure "must be accompanied by a written report – prepared and signed by the witness."  Fed. R. Civ. P. 26(a)(2)(B).  That report must contain, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them," "the facts or data considered by the witness in forming them," the witness's qualifications, a list of certain publications, a list of other cases in which the witness has testified, and a statement of compensation.  Fed. R. Civ. P. 26(a)(2)(B)(i)–(vi).  Rule 26(a)(2)(D) further provides that expert disclosures must be made "at the times and in the sequence that the court orders."  Fed. R. Civ. P. 26(a)(2)(D).

Rule 37(c)(1) sets out the consequence for failing to comply with Rule 26(a).  It provides: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).

Plaintiff did not make a Rule 26(a)(2) expert disclosure in this case.  Discovery was reopened after remand, and the Court set September 30, 2025 as the deadline for completion of all

discovery, including expert discovery. Plaintiff did not serve a Rule 26(a)(2)(B) report from Dr. Branch by that deadline. Instead, when opposing summary judgment, Plaintiff filed an expert affidavit from Dr. Branch that had been prepared for the related Court of Claims action. Dkt. No. 76-4. That related action is a parallel New York State Court of Claims case arising from the same alleged delayed diagnosis and treatment of Mallet's prostate cancer while he was in DOCCS custody. Dr. Branch's affidavit was prepared for that case; it was not served in this federal action as a Rule 26(a)(2)(B) expert report.

Defendants are correct that this Court's order permitting discovery from the Court of Claims action to be used in this action did not suspend the Federal Rules of Civil Procedure. A litigant may not bypass Rule 26(a)(2) simply because a related state-court proceeding follows different expert-disclosure rules. The Federal Rules govern expert disclosure in this Court, and Plaintiff did not comply with them.

Preclusion under Rule 37, however, is not automatic. *See Design Strategy, Inc. v. Davis*, 469 F.3d 284, 298 (2d Cir. 2006) ("To the extent that the Advisory Committee Note calls Rule 37(c)'s exclusion of evidence 'automatic,' however, that characterization cannot be squared with the plain language of Rule 37(c)(1) itself."). In deciding whether preclusion is warranted, courts in this Circuit consider the *Softel* factors: "(1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 961 (2d Cir. 1997). Applying these factors, the Court concludes that the drastic remedy of preclusion is not warranted.

The first *Softel* factor favors Defendants.  Plaintiff's explanation is, essentially, that Dr. Branch's affidavit came from the related Court of Claims action and that this Court permitted Court of Claims discovery to be used here.  And so the Court did.  But the Court did not say that using evidence developed in the Court of Claims permitted non-compliance with the Federal Rules, and it certainly does not excuse noncompliance with Rule 26(a)(2).  The Federal Rules apply in this Court, and Plaintiff had ample notice that expert discovery in this case had to be completed by September 30, 2025.  Plaintiff should have served a proper expert disclosure and report or sought an extension before the deadline expired.

The second factor weighs strongly against preclusion.  Dr. Branch's testimony is important.  This is a medical-care case involving urological symptoms, PSA results, prostate-cancer screening, diagnosis, causation, and the standard of care.  Those are not matters that a lay jury can reliably resolve based only on common experience.  *See Ayuso v. Butkiewicus*, 2020 WL 7043551, at *1 (D. Conn. Dec. 1, 2020) (denying preclusion where a physician's expert testimony was "necessary" and "[w]ithout such testimony, jurors would be left to reach conclusions based on their own experiences.").  Dr. Branch's opinions are especially important to Plaintiff's state-law malpractice and negligence claims, which ordinarily require expert proof of the applicable medical standard of care and departure from that standard.  Precluding Dr. Branch would likely be outcome-determinative as to those claims.  That does not exempt Plaintiff from complying with Rule 26, *see In re Puda Coal Sec. Inc. Litig.*, 30 F. Supp. 3d 230, 253 (S.D.N.Y. 2014), but it counsels against an unnecessarily harsh sanction, *see Martinez v. Janjan Realty Corp.*, 2026 WL 866956, at *1 (S.D.N.Y. Mar. 30, 2026).

The third factor – prejudice – favors Defendants, but not decisively.  Defendants did not receive the orderly expert discovery contemplated by Rule 26.  They did not depose Dr. Branch

before filing their summary judgment reply; they did not serve a rebuttal expert report; and they did not have the benefit of expert discovery before briefing their motion to strike. That is real prejudice, but it is curable. Dr. Branch's opinions were not sprung on the eve of trial. No trial date has been set. His affidavit identifies the records he reviewed, states his central opinions, and attaches a curriculum vitae reflecting his urological qualifications. Dkt. No. 76-4. Defendants thus have notice of what Dr. Branch intends to say and the medical records on which his opinions rest. The appropriate remedy is to allow Defendants to test those opinions through limited expert discovery, including by deposing Dr. Branch and, if they choose, retaining a rebuttal expert, not to bar Plaintiff from offering them altogether. *See Ayuso*, 2020 WL 7043551, at *1 ("[T]he defendant is prejudiced, but that prejudice can be cured to a significant degree.").

The fourth factor also weighs against preclusion. Although the Court would like to set this case for trial in December, that date is not so imminent that a limited reopening of expert discovery will not disrupt my schedule. Any prejudice can be cured by requiring Plaintiff promptly to serve a Rule 26(a)(2)(B)-compliant report from Dr. Branch, allowing Defendants to depose him, and permitting Defendants, if they choose, to serve a rebuttal report limited to the subjects addressed by Dr. Branch. *See Ridgeview Partners, LLC v. Entwistle*, 354 F. Supp. 2d 395, 403–04 (S.D.N.Y. 2005) (denying preclusion where no trial was scheduled and the failure was harmless in light of the opportunity to prepare); *Ayuso*, 2020 WL 7043551, at *1–2 (denying preclusion while allowing deposition and rebuttal expert proof).

This result is also consistent with Judge Carter's approach in *Clayton v. Katz*, 2015 WL 1500248 (S.D.N.Y. Mar. 23, 2015). There, the court recognized that failure to comply with Rule 26 is "no small matter," but emphasized that courts should take a flexible approach. *Clayton*, 2015 WL 1500248, at *5 (citing *Design Strategy*, 469 F.3d at 296–98). The court declined to preclude

expert testimony despite the plaintiff's failure to comply with Rule 26 because there was no evidence of bad faith and a brief reopening of discovery could cure the prejudice. *Id.* at *6. The same practical solution is appropriate here.

The sanction Defendants seek – striking the affidavit and precluding Dr. Branch from testifying at trial – is disproportionate. *See DiPirro v. United States*, 43 F. Supp. 2d 327, 340 (W.D.N.Y. 1999) ("Precluding expert testimony under [Rule 37(c)(1)] is a drastic remedy and should only be applied in cases where the party's conduct represents flagrant bad faith and callous disregard for the requirements of Rule 26(a)(2)(B)."). This is because precluding testimony of an expert for failure to strictly comply with Rule 26 "may at times tend to frustrate the Federal Rules' overarching objective of doing substantial justice to litigants." *Wechsler v. Hunt Health Sys., Ltd.*, 381 F. Supp. 2d 135, 155 (S.D.N.Y. 2003) (citation omitted). The purpose of Rule 37 is not to impose a litigation-ending sanction when a lesser remedy will protect the opposing party and permit the case to be decided on the merits.

Accordingly, Defendants' motion to strike Dr. Branch's affidavit and preclude him from testifying is DENIED. Plaintiff must serve a Rule 26(a)(2)(B)-compliant expert report from Dr. Branch within 14 days of this Order. Defendants may depose Dr. Branch within 14 days after service of that report. If Defendants elect to serve a rebuttal expert report limited to Dr. Branch's opinions, they must do so within 30 days after Dr. Branch's deposition. Defendants may renew any Rule 702 or *Daubert* objections by motion *in limine* before trial.

### B.  Section 1983 Claims and Theories Other Than Eighth Amendment Deliberate Indifference

1.  <u>Fifth and Fourteenth Amendment Medical-Care Theories</u>

A convicted prisoner's claim that prison medical providers were deliberately indifferent to his medical needs is governed by the Eighth Amendment. *See Caiozzo v. Koreman*, 581 F.3d 63,

69 (2d Cir. 2009) ("A convicted prisoner's claim of deliberate indifference to his medical needs by those overseeing his care is analyzed under the Eighth Amendment"), *overruled on other grounds by Darnell v. Pineiro*, 849 F.3d 17 (2d Cir. 2017).  A pretrial detainee's comparable claim is governed by the Fourteenth Amendment.  *See Darnell*, 849 F.3d at 29, 33–35; *Canady v. Correct Care Sols.*, 2017 WL 4280552, at *4 n.6 (S.D.N.Y. Sept. 25, 2017) ("The status of a plaintiff as either a convicted prisoner or pretrial detainee dictates whether his conditions of confinement are analyzed under the Eighth or Fourteenth Amendment").  And if a claim is covered by a specific constitutional provision, the plaintiff may not recast it as a generalized due process claim.  *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997) ("[I]f a constitutional claim is covered by a specific constitutional provision . . . the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."); *accord Graham v. Connor*, 490 U.S. 386, 394–95 (1989).

Mallet asserts a denial-of-medical-care claim under the Fourteenth Amendment and also invokes the Fifth and Fourteenth Amendments as part of a broader constitutional claim.  Those claims fail as independent constitutional theories.

The undisputed record shows that Mallet was a convicted prisoner, not a pretrial detainee, during the treatment at issue.  He testified that he was convicted in March 1999, sentenced in September 1999, and thereafter entered DOCCS custody.  Dkt. No. 76-1, Mallet Dep., 19:8–20:3. He remained in DOCCS custody until January 2019.  *Id.*, 20:18–21:13.  The challenged treatment occurred while Mallet was incarcerated at Woodbourne between April 2017 and November 2018. Dkt. No. 75, ¶¶ 1–4.

That undisputed chronology makes short work of Mallet's Fourteenth Amendment medical-care theory.  Because Mallet was a convicted prisoner when the alleged denial of medical

care occurred, his inadequate-medical-care claim must be analyzed under the Eighth Amendment. His separate Fourteenth Amendment medical-care claim is therefore duplicative of, and displaced by, his Eighth Amendment deliberate-indifference claim.

Mallet's Fifth Amendment theory fares no better. The Fifth Amendment applies to federal action, not to claims against state prison officials or private medical providers alleged to have acted under color of state law. *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002); *Bussey v. Phillips*, 419 F. Supp. 2d 569, 586 (S.D.N.Y. 2006). There is no federal actor in this case. And even if there were, the medical-care theory would still be governed by the more specific Eighth Amendment standard, not by generalized due process principles.

Summary judgment is therefore GRANTED to Defendants dismissing Mallet's separate Fifth and Fourteenth Amendment medical-care theories.

Before turning to Mallet's remaining Section 1983 theories, one point bears emphasis. Federal courts adhere to the principle of party presentation. *See Margolin v. Nat'l Ass'n of Immigr. Judges*, 2026 WL 1463466, at *2 (U.S. May 26, 2026) (per curiam). That principle – the "rule that points not argued will not be considered" – distinguishes the adversarial system from an inquisitorial one. *Id.* (quoting *United States v. Burke*, 504 U.S. 229, 246 (1992) (Scalia, J., concurring in judgment)). Courts therefore rely on the parties to "frame the issues for decision" and decide "only the questions presented." *Id.* (quoting *United States v. Sineneng-Smith*, 590 U.S. 371, 375–76 (2020)). Courts are not "roving commissions," *id.* at 3, tasked with constructing claims or arguments that a represented party has elected not to pursue. This principle reinforces the usual rule that arguments not developed in opposition to summary judgment are forfeited. *See, e.g.*, *Palmieri v. Lynch*, 392 F.3d 73, 87 (2d Cir. 2004).

2.  Retaliation

Mallet's retaliation claim is forfeited.  Defendants expressly moved for summary judgment on the retaliation claim.  Dkt. No. 68 at 20–21.  Mallet's opposition does not meaningfully defend that claim; it addresses deliberate indifference, limitations, and qualified immunity, but does not identify evidence supporting a separate retaliation theory.  Dkt. No. 74 at 16–25.  Under the party-presentation principles just discussed, the Court need not construct a retaliation theory that Mallet does not press.  *See, e.g., Alberty v. Hunter*, 144 F.4th 408, 420 (2d Cir. 2025) ("Issues not sufficiently argued in briefs are considered abandoned."); *Anti–Monopoly, Inc. v. Hasbro, Inc.*, 958 F. Supp. 895, 907 n.11 (S.D.N.Y. 1997) (finding plaintiff's failure to provide arguments in opposition to defendant's motion "provides an independent basis for dismissal" and "constitutes abandonment of the issue"), *aff'd*, 130 F.3d 1101 (2d Cir. 1997).

The retaliation claim also suffers from an independent limitations problem.  A Section 1983 claim in New York is subject to a three-year statute of limitations.  *See Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013).  Unlike Mallet's deliberate-indifference claim, which the Second Circuit held accrued by reference to when Mallet knew or should have known that he had prostate cancer, a retaliation claim based on discrete retaliatory acts accrues when the plaintiff knew or had reason to know of the alleged retaliatory act.  *See Smith v. Campbell*, 782 F.3d 93, 100 (2d Cir. 2015).  Mallet identifies no evidence showing when the alleged retaliatory acts occurred – including when his legal mail allegedly disappeared, when visits were allegedly delayed, when packages were allegedly stolen, or when his TENS machine was allegedly confiscated.  *See* Dkt. No. 36, ¶¶ 121–22.  Nor does he identify any timely retaliatory act by either remaining defendant.  That failure supplies an additional basis for summary judgment.  Even assuming Mallet receives the benefit of any applicable COVID-era tolling of the limitations period, he has not carried his burden at

summary judgment to identify evidence from which a reasonable jury could find that a timely retaliatory act occurred.

The claim fails on the merits in any event. It is well established that "retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983." *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996); *see also Dolan v. Connolly*, 794 F.3d 290, 294–95 (2d Cir. 2015). To prevail on a First Amendment retaliation claim, a prisoner must show that (1) "the speech or conduct at issue was protected," (2) "the defendant took adverse action against the plaintiff," and (3) "there was a causal connection between the protected speech and the adverse action." *Dolan*, 794 F.3d at 294 (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)). At summary judgment, the plaintiff bears the burden of showing that the protected conduct was "a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003).

Courts examine prisoner-retaliation claims with care. As the Second Circuit has cautioned, such claims are "prone to abuse" because prisoners can characterize virtually any adverse prison decision as retaliatory. *Graham*, 89 F.3d at 79 (citation omitted). The Second Circuit has likewise instructed district courts to "approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official – even those otherwise not rising to the level of a constitutional violation – can be characterized as a constitutionally proscribed retaliatory act." *Dolan*, 794 F.3d at 295 (quoting *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003)). A retaliation claim must therefore be "supported by specific and detailed factual allegations," not stated "in wholly conclusory terms." *Id.* (citation omitted).

Here, the amended complaint alleges that Mallet was retaliated against because he requested medical treatment and made sick-call requests. Dkt. No. 36, ¶¶ 120–25. It alleges that, as retaliation, defendants made his legal mail disappear, made him wait longer for visits, stole his packages, and confiscated his TENS machine – a transcutaneous electrical nerve stimulation device used to relieve pain. *Id.*, ¶¶ 121–22.

The Court need not decide whether requesting medical treatment or making sick-call requests, without more, is protected First Amendment activity. Courts in this Circuit have recognized that the issue is unsettled and have often assumed, without deciding, that requests for medical care can constitute protected conduct. *See James v. Gage*, 2019 WL 1429520, at *15 (S.D.N.Y. Mar. 29, 2019) ("The court has found no Supreme Court authority as to whether the First Amendment confers upon a prisoner the right to demand necessary medical attention and courts in the Second Circuit have not decided the issue." (quoting *Brown v. White*, 2010 WL 985184, at *12 (N.D.N.Y. Mar. 15, 2010))). The Court makes the same assumption here.

But even assuming protected conduct, Mallet has not identified evidence satisfying the adverse-action or causation elements. Mallet offers no evidence from which a reasonable jury could find that either Dr. Makram or Dr. Stellato caused his legal mail to disappear, delayed visits, stole packages, or had anything to do with those alleged events. Nor is there evidence that Dr. Stellato – an outside urologist who saw Mallet for urological evaluation – took any adverse action against him because he requested medical treatment. The only retaliatory act specifically attributed to either remaining defendant is the allegation that Dr. Makram confiscated Mallet's TENS machine, which was used for back pain. Dkt. No. 36, ¶ 122. But Mallet has not come forward with evidence showing that any such confiscation was motivated by his sick-call requests or medical complaints. *See Graham*, 89 F.3d at 79. Temporal proximity alone would not be

enough here, but in any event the record does not identify when the alleged confiscation occurred, what request or complaint supposedly triggered it, or how that event was connected to the prostate-cancer treatment decisions at issue in this case. *See Morrow v. Bauersfeld*, 2022 WL 17097590, at \*2 (2d Cir. Nov. 22, 2022) ("Temporal proximity alone is insufficient for a prisoner's retaliation claim to survive summary judgment.").

Mallet's First Amendment retaliation claim cannot survive summary judgment without evidence that a timely retaliatory act occurred, that Defendants took adverse action because Mallet engaged in protected conduct, and that they acted with retaliatory motive. Summary judgment is therefore GRANTED to Defendants on Mallet's retaliation claim.

### 3. Failure to Intervene

Mallet's failure-to-intervene claim is likewise forfeited. Defendants moved for summary judgment on the failure-to-intervene claim. Dkt. No. 68 at 21–22. Mallet's opposition does not meaningfully defend that claim or identify evidence supporting it as a separate theory. Dkt. No. 74 at 16–25.

The claim also fails independently on the merits. "It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). An officer who fails to intervene may be liable for preventable harm caused by another officer if (1) the officer had reason to know that a constitutional violation was occurring and (2) had "a realistic opportunity to intervene to prevent the harm from occurring." *Id.*; *see also Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997). Whether a defendant had a realistic opportunity to intervene is ordinarily a jury

question, but not if, "considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Anderson*, 17 F.3d at 557.

The doctrine does no meaningful work here.  Mallet does not identify a separate constitutional violation committed by another officer or medical provider that Dr. Makram or Dr. Stellato observed and had a realistic opportunity to stop.  Instead, his failure-to-intervene claim alleges that Defendants failed to protect him from the same inadequate medical care that forms the basis of his Eighth Amendment deliberate-indifference claim.  *See* Dkt. No. 36, ¶¶ 131–38.  That is not a separate failure-to-intervene theory; it is the direct medical-indifference theory by another name.

A failure-to-intervene claim is meant to impose liability on a defendant who fails to stop someone else's constitutional violation.  It is not a vehicle for imposing a second layer of liability on the same defendant for the same conduct that allegedly violated the Constitution in the first place.  *See Buchy v. City of White Plains*, 2015 WL 8207492, at \*3 (S.D.N.Y. Dec. 7, 2015) ("When a law enforcement officer 'is a direct participant in the allegedly excessive use of force, the failure to intervene theory of liability is inapplicable.'" (quoting *Cuellar v. Love*, 2014 WL 1486458, at \*8 (S.D.N.Y. Apr. 11, 2014))).  Although excessive-force and failure-to-intervene claims may sometimes proceed in the alternative, that is so when the record would allow a jury to find that one defendant committed the violation while another stood by and failed to stop it.  *See id.*  That is not this record.

As to Dr. Stellato, Mallet identifies no evidence that Stellato was present for, knew of, or had a realistic opportunity to prevent any separate unconstitutional act by Dr. Makram, Ritaccio, correction officers, or unidentified medical personnel.  Stellato's alleged liability turns on what he

himself did or failed to do as the third-party consulting urologist.  That theory is addressed under the Eighth Amendment.

As to Dr. Makram, Mallet likewise does not identify any evidence supporting a distinct failure-to-intervene claim.  He contends that Makram reviewed his records, supervised Woodbourne medical care, failed to pursue further urological evaluation, and failed to act on his October 2018 PSA result.  These allegations, if credited, may support direct deliberate-indifference liability.  But they do not show that Makram had a realistic opportunity to intervene in someone else's constitutional violation separate from her own alleged failure to provide adequate medical care.

Summary judgment is therefore GRANTED to Defendants on Mallet's failure-to-intervene claim.

### 4.  Supervisory Liability

As an initial matter, Mallet has forfeited any standalone supervisory-liability theory. Defendants moved for summary judgment on that claim.  Dkt. No. 68 at 22–23.  Mallet's opposition, however, focuses only on deliberate indifference, timeliness, and qualified immunity; it does not identify evidence or make any developed argument in support of a separate claim for supervisory responsibility.  Dkt. No. 74 at 16–25.  An argument "adverted to [only] in a perfunctory manner, unaccompanied by [any] effort at developed argumentation," is "deemed waived," *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001) – or, more precisely, forfeited. *See In re Demetriades*, 58 F.4th 37, 54 (2d Cir. 2023); *United States v. Graham*, 51 F.4th 67, 79–80 (2d Cir. 2022).  Here, Mallet does not even advert to the theory in a perfunctory manner.

His claim also fails on the merits.  Section 1983 does not impose *respondeat superior* liability.  "[P]ersonal involvement of defendants in alleged constitutional deprivations is a

prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 886 (2d Cir. 1991)); *see also Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981) ("Section 1983 will not support a claim based on a *respondeat superior* theory of liability.").

Before *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Second Circuit recognized several ways to prove supervisory personal involvement. *See, e.g., Provost v. City of Newburgh*, 262 F.3d 146, 154–55 (2d Cir. 2001) (recognizing supervisory personal involvement based on personal participation, gross negligence in supervision, or deliberate indifference to information indicating that unconstitutional acts were occurring). After *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), there is no separate, relaxed rule for supervisory liability. *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020); *see also Walker v. Velez*, 2025 WL 2381701, at *7 (S.D.N.Y. Aug. 15, 2025) (Briccetti, J.) ("[T]he mere fact of occupying a supervisory position cannot establish liability for federal constitutional violations unless plaintiff shows personal involvement."). Because vicarious liability is inapplicable to § 1983 suits, a plaintiff must prove that "each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

This rule defeats Mallet's supervisory-liability claim.

Dr. Stellato was an outside urology consultant; Mallet identifies no evidence that Dr. Stellato supervised any DOCCS medical provider or correctional employee. So as a simple matter of fact, no supervisory-liability theory lies against him.

As to Dr. Makram, Mallet's evidence matters only insofar as it shows her own involvement in the alleged denial of medical care. Mallet contends that Dr. Makram reviewed his chart, oversaw Woodbourne medical care, approved or failed to approve referrals, failed to follow up on

his urinary complaints, and failed to act on the October 2018 PSA result.  Those allegations may support direct Eighth Amendment liability if a jury finds that Dr. Makram herself knew of and disregarded a substantial risk to Mallet's health.  But they do not support a separate claim for supervisory liability based merely on Dr. Makram's position as Facility Health Services Director.

Summary judgment is therefore GRANTED to Defendants on Mallet's separate supervisory-liability claim.

### 5.  Conspiracy

Mallet's Section 1983 conspiracy claim is also forfeited.  Defendants moved for summary judgment on that claim.  Dkt. No. 68 at 23–24.  Mallet's opposition does not develop any conspiracy theory, identify the participants in any alleged agreement, or cite evidence from which a reasonable jury could find a meeting of the minds.  Dkt. No. 74 at 16–25.  The Court will not supply a conspiracy theory that Mallet does not advance.

The claim also fails on the merits.  To prove a Section 1983 conspiracy, a plaintiff must show "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002).  A plaintiff must also show "that defendants entered into an agreement, express or tacit, to achieve the unlawful end."  *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003).  Conclusory allegations are not enough.  "It is well settled that claims of conspiracy containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Brook v. Ruotolo*, 2024 WL 3912831, at *3 (2d Cir. Aug. 23, 2024) (summary order), *cert. denied*, 145 S. Ct. 2705 (2025) (citing *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011)).  At summary

judgment, Mallet must do more than plead a conspiracy; he must point to evidence from which a reasonable jury could find one.

He has not done so.  The record, viewed in Mallet's favor, would permit a jury to find that Dr. Makram and Dr. Stellato each individually failed to take adequate steps to evaluate the risk that Mallet had prostate cancer.  But a failure by two medical providers to pursue the testing that Plaintiff says should have been ordered is not, without more, evidence of an agreement to violate Plaintiff's constitutional rights.  *See Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) (holding that a "mere disagreement over the proper treatment" is not actionable).  Mallet identifies no communication, coordinated plan, shared unlawful objective, or overt act from which a jury could infer that Dr. Makram and Dr. Stellato agreed – expressly or tacitly – to deny him constitutionally adequate medical care.

Nor does the record support a conspiracy theory involving unidentified DOCCS medical or correctional personnel.  To the extent Mallet alleges that Woodbourne personnel collectively failed to respond appropriately to his medical complaints, that theory is addressed by his Eighth Amendment deliberate-indifference claim.  At summary judgment, a conspiracy claim requires evidence of an agreement to accomplish an unlawful objective – and Mallet identifies none.  *See United States v. Romero*, 897 F.2d 47, 50 (2d Cir. 1990) ("The essential element of a conspiracy is an agreement to accomplish an unlawful act.").

Finally, to the extent Mallet's conspiracy theory rests on an alleged agreement among DOCCS employees acting within the scope of their employment, the claim would also be barred by the intracorporate-conspiracy doctrine.  Under that doctrine, "because employees acting within the scope of their employment are agents of their employer, an employer and its employees are generally considered to be a single actor, rather than multiple conspirators." *Fed. Ins. Co. v. United*

*States*, 882 F.3d 348, 368 (2d Cir. 2018).   The Second Circuit has applied the intracorporate-conspiracy doctrine to claims under 42 U.S.C. § 1985.  *See Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978).  Although the Second Circuit has not squarely held that the doctrine applies to Section 1983 conspiracy claims, courts in this District have applied the doctrine in Section 1983 cases as well.  As then-Judge Mukasey explained, "In the absence of controlling contrary authority, this court will continue to apply the intracorporate conspiracy doctrine to Section 1983 claims because the doctrine's logic is sound."  *Anemone v. Metro. Transp. Auth.*, 419 F. Supp. 2d 602, 604 (S.D.N.Y. 2006).

Moreover, Mallet identifies no evidence that any DOCCS employee falls within the "personal stake" exception to the intracorporate-conspiracy doctrine – that is, no evidence that any DOCCS employee was "pursuing personal interests wholly separate and apart from the entity." *Ali v. Connick*, 136 F. Supp. 3d 270, 282–83 (E.D.N.Y. 2015).  So any conspiracy theory premised solely on coordination among DOCCS personnel acting within the scope of their employment fails for this additional reason.  The intracorporate-conspiracy doctrine need not be extended to Dr. Stellato, who is described as an outside urology consultant, because the record contains no evidence that he entered into any agreement with anyone to violate Mallet's constitutional rights.

Mallet's "bald allegation of conspiracy simply is not enough at the summary judgment stage."  *See Wantanabe Realty Corp. v. City of New York*, 315 F. Supp. 2d 375, 395 (S.D.N.Y. 2003) (Kaplan, J.).  Summary judgment is therefore GRANTED to Defendants dismissing Mallet's Section 1983 conspiracy claim.

And so we turn to what this case is actually about: Eighth Amendment deliberate indifference, alleged as to the conduct of two physicians.

1.  Legal Standard

The Eighth Amendment prohibits "cruel and unusual punishments."  U.S. Const. amend. VIII.    This prohibition requires prison officials to provide incarcerated persons with constitutionally adequate medical care.  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  In *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), the Supreme Court held that "deliberate indifference to serious medical needs of prisoners" can constitute the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment.  That is true whether the deliberate indifference is "manifested by prison doctors in their response to the prisoner's needs" or by prison officials "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  *Id.* at 104–05.

An Eighth Amendment medical-care claim has both an objective and a subjective component.  *See Hill v. Curcione*, 657 F.3d 116, 122–23 (2d Cir. 2011).  The objective component asks whether the plaintiff had a serious medical need and whether the challenged deprivation of care was "sufficiently serious."  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  A medical need is sufficiently serious if it presents "a condition of urgency, one that may produce death, degeneration, or extreme pain."  *Hill*, 657 F.3d at 122 (citation omitted).  Relevant factors include whether "a reasonable doctor or patient would find [the condition] important and worthy of comment or treatment," whether the condition "significantly affects an individual's daily activities," and whether it causes "chronic and substantial pain."  *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).

When a prisoner receives some treatment but claims that the treatment was inadequate, the objective inquiry is more focused.  The Court asks whether the particular risk created by the alleged inadequacy in treatment was sufficiently serious.  *See Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003) ("When the basis for a prisoner's Eighth Amendment claim is a temporary delay or

- 36 -

interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone."). A condition that may initially appear treatable or non-emergent can become constitutionally serious if, left untreated or inadequately treated, it "could result in further significant injury[.]" *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000) (quoting *Chance*, 143 F.3d at 702).

The subjective component requires proof that the defendant acted with deliberate indifference. Because Mallet was a convicted prisoner, his claim is governed by the Eighth Amendment standard set out in *Farmer v. Brennan*, not by *Darnell*'s Fourteenth Amendment standard for pretrial detainees. Under *Farmer*, a prison official "cannot be found liable under the Eighth Amendment" unless the official "knows of and disregards an excessive risk to inmate health or safety." 511 U.S. at 837. The official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and "must also draw the inference." *Id.* But subjective knowledge may be proved by circumstantial evidence; "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842. Thus, "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways." *Id.*; *see also Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996).

The Eighth Amendment is not a medical-malpractice statute. "Medical malpractice does not rise to the level of a constitutional violation unless the malpractice involves culpable recklessness." *Hill*, 657 F.3d at 123. "[M]ere disagreement over the proper treatment" does not establish an Eighth Amendment claim. *Chance*, 143 F.3d at 703. But a medical provider may act with deliberate indifference by consciously choosing "an easier and less efficacious" course of

treatment, *id.*, or by refusing or delaying medically necessary care despite knowledge of a substantial risk of serious harm.

    2.  <u>Application</u>

        a.  Objective Seriousness

The objective component is satisfied. Prostate cancer is a serious medical condition. Indeed, the Second Circuit noted at the pleading stage that Defendants did "not . . . dispute that terminal prostate cancer is an objectively serious medical condition." *Mallet v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 126 F.4th 125, 137 (2d Cir. 2025).

Mallet's theory is that Defendants failed to pursue timely cancer-related testing or follow-up despite persistent urinary obstruction, continued complaints after Flomax was prescribed, the September 2017 cystoscopy findings, and the October 2018 PSA result. Viewed in Mallet's favor, the alleged deprivation exposed him to the risk that prostate cancer would go undiagnosed and untreated until it progressed. That risk is sufficiently serious to satisfy the objective component.

The National Cancer Institute ("NCI") explains that "PSA" is "a protein produced by normal, as well as malignant, cells of the prostate gland," and that PSA testing may be used "to follow up on prostate symptoms, such as painful or frequent urination, blood in urine or semen, and pelvic and/or back pain." *Prostate-Specific Antigen (PSA) Test*, Nat'l Cancer Inst., https://perma.cc/L475-D8N5 (last updated Jan. 31, 2025). The NCI also explains that "There is no single threshold that distinguishes a normal versus an abnormal PSA result" and that, if PSA "continues to rise—especially if it rises quickly," "the doctor may recommend a prostate biopsy without further testing." *Id.* Similarly, the American Urological Association and Society of Urologic Oncology guideline states that "When screening for prostate cancer, clinicians should use PSA as the first screening test," and that "For people with a newly elevated PSA, clinicians

should repeat the PSA prior to a secondary biomarker, imaging, or biopsy." *Early Detection of Prostate Cancer*, Am. Urological Ass'n & Soc'y of Urologic Oncology, (2023, amended 2026), https://perma.cc/QDW6-MY68.   The Court does not rely on these materials to resolve the applicable standard of care or to decide what Defendants actually knew.   But the materials underscore why Plaintiff's PSA-based follow-up theory is hardly medically fanciful.

### b.   Subjective Deliberate Indifference

The real dispute lies in the subjective component: whether a reasonable jury could find that Dr. Makram or Dr. Stellato actually knew of and consciously disregarded a substantial risk that Mallet's symptoms reflected prostate cancer.

Dr. Makram's involvement with Plaintiff was prolonged and ongoing.   She was Mallet's Woodbourne medical provider, she remained involved after Dr. Stellato's 2017 urology evaluation, and she had access to the later October 2018 PSA result.

Dr. Stellato, on the other hand, only saw Mallet as an outside urology consultant in 2017, performed the cystoscopy, and is not shown to have participated in Mallet's care after the summer of 2017.   There is no evidence that he was consulted about or ever saw Mallet's October 2018 PSA score.   On this record, the Eighth Amendment claim survives against Dr. Makram but not against Dr. Stellato.

### c.   Dr. Makram

A reasonable jury could find that Dr. Makram was aware of facts suggesting a substantial risk that Mallet's urinary symptoms required further cancer-related evaluation and that she failed to take reasonable steps in response.

Mallet's evidence, viewed favorably to him, shows that Dr. Makram was his Woodbourne medical provider and Facility Health Services Director; that she knew he was experiencing

- 39 -

persistent urinary obstruction and related urinary complaints; that she reviewed Dr. Stellato's September 2017 cystoscopy report; that she continued Flomax despite Mallet's lack of meaningful improvement; and that she did not refer him back to urology or order further prostate-cancer testing after the October 2018 PSA result of 3.60. Dkt. No. 75, ¶¶ 145–55, 169–87; Dkt. No. 76-7 at 10–11. Unlike Dr. Stellato, Dr. Makram was not limited to a discrete urology consultation. She remained responsible for Mallet's care at Woodbourne over an extended period and was positioned to reassess his condition as his urinary complaints persisted and additional information became available.

Defendants argue that Dr. Makram reasonably understood Mallet's symptoms as consistent with BPH, bladder dysfunction, or a possible neurological problem; that she relied on specialist input; and that the October 2018 PSA result was within the laboratory reference range. A jury could accept that view. But a jury could also credit Mallet's contrary evidence: that his symptoms persisted despite Flomax, that the cystoscopy could not rule out prostate cancer, that the neurological route did not explain his urinary complaints, and that the increase in PSA values from 1.77 in 2011 to 3.60 in October 2018 – or, crediting the disputed 2017 notation of 2.2, from 2.2 to 3.60 in approximately one year – was medically significant even if the absolute number remained below the lab cutoff. At that point, a reasonable jury could find that continued reliance on the same benign explanation, without repeat PSA testing, renewed urology referral, or other cancer-related follow-up, was not merely a different medical judgment but a refusal to respond reasonably to an obvious cancer risk. *See Farmer*, 511 U.S. at 842 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.").

This is not merely a disagreement over preferred treatment, *see Chance*, 143 F.3d at 703, if a jury finds that Dr. Makram knew Mallet's course of treatment was failing and nonetheless

chose not to pursue further urological or cancer-related evaluation. *See Suarez v. Morton*, 170 F.4th 33, 60, 62 (2d Cir. 2026) (explaining that deliberate indifference requires recklessness, not intent to harm, and that competing inferences about knowledge and disregard must be resolved by the jury at summary judgment). *Chance* makes the dividing line clear. "So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance*, 143 F.3d at 703. But "In certain instances, a physician may be deliberately indifferent if he or she consciously chooses 'an easier and less efficacious' treatment plan." *Id.*

Mallet's theory falls on the latter side of the line if the jury credits his evidence. He does not argue merely that another doctor might have ordered different testing sooner. He argues that Dr. Makram knew that his urinary obstruction persisted despite treatment, knew that the September 2017 cystoscopy did not rule out prostate cancer, had before her an October 2018 PSA result that Plaintiff says reflected a medically significant increase from prior values, and still did not order repeat PSA testing, refer him back to urology, or otherwise pursue cancer-related follow-up. A reasonable jury could find that, once the treatment course failed to resolve his persistent urinary complaints and the PSA trend emerged, continued reliance on the same benign explanation without further investigation amounted to conscious disregard rather than mere malpractice. *See Rosado v. Lee*, 2026 WL 880261, at *8 (S.D.N.Y. Mar. 31, 2026) (denying summary judgment for defendant physician where there was evidence that physician "was aware of the ineffectiveness of the medical treatment.").

This conclusion follows from the governing standard. Deliberate indifference requires more than negligence, but it may be shown where an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."

*Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000) (quoting *Farmer*, 511 U.S. at 847).  And, as *Harrison* explains, if prison officials deliberately ignore a condition that requires treatment, "the failure to provide appropriate treatment might well violate the Eighth Amendment."  *Id.* (quoting *Chance*, 143 F.3d at 702).

The record here permits competing inferences: negligence or malpractice on one hand, deliberate indifference on the other.  That is precisely the sort of dispute *Suarez* instructs must be resolved by a jury, not by the Court on summary judgment.  *See Suarez*, 170 F.4th at 62.  The choice between the two inferences depends on what Dr. Makram knew, what she inferred from the information before her, and why she did not pursue further testing or referral.  Those are jury questions.

Dr. Makram's motion for summary judgme dismissing the Eighth Amendment claim is, therefore, DENIED.

d.  Dr. Stellato

Mallet's claim against Dr. Stellato stands on different footing.  Summary judgment is GRANTED dismissing the Eighth Amendment claim against him.

Dr. Stellato's role in Mallet's care was limited.  He saw Mallet as an outside urology consultant in July 2017 and September 2017.  At the July visit, he performed a physical examination and a digital rectal examination.  The record reflects that Mallet complained of incomplete bladder emptying; that Dr. Stellato found Mallet's prostate to be mildly enlarged; and that no nodules or induration were noted.  Dkt. No. 67, ¶¶ 16, 21–25; Dkt. No. 75, ¶¶ 16, 21–25.  Dr. Stellato then ordered a cystoscopy, which was performed in September 2017.  Dkt. No. 67, ¶¶ 30–38; Dkt. No. 75, ¶¶ 30–38.  He never saw Mallet thereafter.

The cystoscopy confirmed urinary retention and urinary obstructive symptoms and showed mild congestion of the prostatic lobe, posterior urethra, and bladder neck.  Dkt. No. 67, ¶¶ 36–37;

Dkt. No. 75, ¶¶ 36–37.  Dr. Stellato concluded that Mallet's bladder was not emptying properly, that the problem might have a neurological component, and he recommended neurological evaluation.    Dkt. No. 67, ¶¶ 30–35; Dkt. No. 75, ¶¶ 30–35.    His post-operative report also instructed that Mallet continue Flomax.  Dkt. No. 66, Stellato Decl., ¶¶ 39–41.  Aside from performing the July 2017 examination, performing the September 2017 cystoscopy, recommending continued medication and neurological follow-up, and writing his report, Dr. Stellato is not alleged to have had further involvement in Mallet's treatment.  *See* Dkt. No. 66, Stellato Decl., ¶ 45.  There is no evidence that Dr. Stellato saw the October 2018 PSA result of 3.60 at the time or participated in Mallet's care after that result was obtained.

Mallet points to evidence that a cystoscopy cannot confirm or rule out prostate cancer, that early-stage prostate cancer would not necessarily be visible on cystoscopy, that a biopsy is needed to diagnose prostate cancer, and that poor response to Flomax is a factor a physician considers in evaluating possible malignancy.  Dkt. No. 75, ¶¶ 169–80.  This evidence may support Mallet's argument that a reasonably prudent urologist should have ordered further testing, and it may bear on the state-law malpractice claim.  But it does not, without more, permit a reasonable jury to find Eighth Amendment deliberate indifference.

The subjective component requires evidence that Dr. Stellato actually knew of and disregarded a substantial risk that Mallet had prostate cancer.  *Farmer*, 511 U.S. at 837.  The fact that a cystoscopy could not definitively rule out early-stage prostate cancer does not show that Dr. Stellato actually suspected prostate cancer.  Nor does the fact that a biopsy is the definitive diagnostic test for prostate cancer mean that every failure to order a biopsy after urinary complaints amounts to constitutional recklessness.  The Eighth Amendment does not require a prison medical

provider to rule out every theoretical diagnosis. It prohibits a "'deliberate indifference' to a substantial risk of serious harm." *Id.* at 828.

Here, the record would permit a jury to find that Dr. Stellato was wrong, or perhaps negligent, in attributing Mallet's symptoms to BPH, bladder dysfunction, or a neurological cause rather than pursuing PSA testing or biopsy. But the record does not permit a reasonable finding that Dr. Stellato actually inferred that Mallet faced a substantial risk of prostate cancer and then consciously chose to disregard that risk. Unlike Dr. Makram, Dr. Stellato did not have an ongoing course of treatment during which he could observe repeated failures of the same treatment plan, review later urinary complaints, or respond to the October 2018 PSA result. The record therefore shows, at most, that Dr. Stellato may have made an incomplete or negligent diagnostic judgment during a limited 2017 urology consultation. *Estelle* and *Farmer* do not constitutionalize that kind of alleged medical misdiagnosis. *See Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Farmer*, 511 U.S. at 837.

The Second Circuit's decision does not require a different result. The Circuit held that Mallet's allegations plausibly pleaded a deliberate-indifference claim against Dr. Stellato at the pleading stage. *Mallet*, 126 F.4th at 137. But plausibility is not the summary judgment standard. After discovery, Mallet must point to evidence from which a reasonable jury could find subjective recklessness. He has not done so as to Dr. Stellato.

Summary judgment is therefore granted to Dr. Stellato on Mallet's Eighth Amendment deliberate-indifference claim.

### C.  Statute of Limitations

Defendants also argue that Mallet's Eighth Amendment claim is time-barred.  Because the Eighth Amendment claim against Dr. Stellato is dismissed on the merits, the Court need not decide whether that claim is also barred by the statute of limitations.  The Court addresses the limitations defense principally as to the surviving Eighth Amendment claim against Dr. Makram.  To avoid any possible ambiguity, however, the Court also explains why any Eighth Amendment claim against Dr. Stellato would be untimely.

The limitations period for a Section 1983 claim in New York is three years.  N.Y. C.P.L.R. § 214(5); *Milan v. Wertheimer*, 808 F.3d 961, 963 (2d Cir. 2015).  Federal courts borrow not only the state limitations period for Section 1983 claims, but also the State's tolling rules, unless those rules are inconsistent with federal law.  *See Pearl v. City of Long Beach*, 296 F.3d 76, 80 (2d Cir. 2002) (citing *Board of Regents v. Tomanio*, 446 U.S. 478, 484–86 (1980)).  New York's COVID-19 executive orders tolled limitations periods from March 20, 2020 to November 3, 2020, adding 228 days to limitations periods that were running during that interval.  *See Brash v. Richards*, 195 A.D.3d 582, 584–85 (2d Dep't 2021) (collecting New York State executive orders).

Mallet filed this action on February 25, 2022.  Without the COVID toll, a Section 1983 claim filed on that date would be timely only if it accrued on or after February 25, 2019.  With the 228-day COVID toll, however, a claim that accrued on July 12, 2018 would be timely.  The ordinary three-year limitations period would have expired on July 12, 2021, and the COVID toll extended that filing deadline by 228 days, to February 25, 2022.  Thus, for the surviving claim against Dr. Makram, Defendants are entitled to summary judgment on limitations grounds only if the undisputed record shows that the claim accrued before July 12, 2018.  The toll does not alter the accrual date; it simply extends the time within which Mallet could sue.

And the Second Circuit has already explained the governing accrual rule in this very case. A Section 1983 claim accrues when the plaintiff knew or should have known the facts necessary to establish the claim. *Mallet*, 126 F.4th at 131 ("A Section 1983 claim does not accrue until the plaintiff 'has a complete and present cause of action.'" (citing *Smith v. Campbell*, 782 F.3d 93, 100 (2d Cir. 2015)). For Mallet's deliberate-indifference claim, "the injury for which Mallet seeks relief is cancer," so "the relevant question is when he knew or should have reasonably known that he had prostate cancer." *Id.* at 128. The Circuit held that Mallet's claim "could not have accrued until he either knew or had reason to know both (1) that he suffered from an objectively serious medical condition while he was incarcerated and (2) that Defendants[] failed to provide adequate treatment because they consciously disregarded a substantial risk to his health and safety." *Id.* at 132.

This standard leaves no room for Defendants' argument that Mallet's claim against Dr. Makram necessarily accrued outside the limitations period by the time Mallet was released from DOCCS custody on January 16, 2019. Dkt. No. 75, ¶ 4. First, January 16, 2019 is within the limitations period because of the COVID toll, which added 228 days to the limitations period and so extended the filing deadline well beyond February 25, 2022. And to the extent Defendants argue that Mallet's symptoms during custody establish even earlier accrual – an argument with which this court initially agreed (and frankly, with which I still agree), the Second Circuit rejected the premise that awareness of persistent urinary symptoms is the same as actual or constructive awareness of prostate cancer. It explained that "although Mallet surely knew that he had some kind of persistent medical problem which the Flomax was not addressing," it was "not reasonable to infer that he either knew or should have known that he was suffering from this particular serious medical condition—cancer—when none of the doctors he saw in prison gave him any indication

that his condition was possibly cancer." *Mallet*, 126 F.4th at 133. "Throughout his incarceration," the Circuit continued, "Mallet could have reasonably assumed that he was experiencing 'uncomfortable and annoying' urinary problems, which might qualify as serious, but not the symptoms of the serious underlying condition—cancer—as to which he is suing." *Id.* at 133–34.

Discovery has not eliminated that factual dispute as to Dr. Makram – far from it. Defendants point to Mallet's longstanding urinary symptoms, his continued complaints, and the fact that he sought medical attention after release. But those facts do not establish, as a matter of law, that Plaintiff knew or reasonably should have known before July 12, 2018 that those problems reflected prostate cancer, or that Dr. Makram had consciously disregarded a prostate-cancer risk. Mallet was released to parole supervision and to Bellevue Hospital shelter, where he lived for approximately two years. Dkt. No. 75, ¶¶ 59–60; Dkt. No. 76-1, Mallet Dep., 21:21–22:25. He testified that, after release, he sought outside medical care because he "kept having the same problems" he had while incarcerated and they were "getting worse," not because he already knew he had prostate cancer. Dkt. No. 76-1, Mallet Dep., 167:4–18. He also testified, in discussing PSA testing and diagnosis, "Like I said, I'm not a doctor." *Id.*, 166:15–22.

Moreover, the post-release medical chronology underscores why the limitations question cannot be resolved in Defendants' favor as to Dr. Makram as a matter of law. The record evidence cited by the parties places the first markedly elevated post-release PSA result in August 2020 – well after July 12, 2018 – and the prostate-cancer diagnosis in April 2021. Mallet's post-release records show a PSA result of 8.43 in August 2020, followed by elevated PSA results of 6.49 in October 2020 and 6.37 in February 2021. Dkt. No. 76-5 at 12. He then underwent a prostate biopsy at Woodhull Hospital on April 6, 2021, and the Woodhull records reflect that the biopsy confirmed adenocarcinoma of the prostate. Dkt. No. 76-5 at 9–12; Dkt. No. 75, ¶¶ 215–17. In

May 2021, Kings County confirmed the prostate-cancer diagnosis and staged the cancer at a Gleason score of 9.  Dkt. No. 76-6 at 1–3; Dkt. No. 75, ¶¶ 221–22.

The Second Circuit anticipated exactly this factual uncertainty about accrual.  A prisoner may know he has persistent symptoms before he knows, or reasonably should know, that those symptoms are attributable to cancer and that prison medical providers consciously disregarded that cancer risk.  *See Mallet*, 126 F.4th at 132.  The Circuit held that, "Determining the exact accrual date in this context may ultimately be a task for the factfinder," because "It will depend, most of all, on what exactly Mallet's post-release providers told him and when they told him." *Mallet,* 126 F.4th at 134.  The Circuit further explained that "the moment at which Mallet knew or should have known his serious medical condition was possibly cancer is a question of fact." *Id.* at 136.

Dr. Stellato's situation is different. Stellato last saw Mallet in 2017.  Unlike Dr. Makram, he did not have an ongoing treatment relationship with Mallet into 2018, and the record does not support an inference that he had any opportunity after 2017 to provide, withhold, delay, or modify treatment.  A deliberate-indifference claim requires deliberately indifferent conduct by the defendant; a physician cannot consciously disregard a serious medical risk during a period when he is no longer treating the patient and has no responsibility for the patient's care.  Thus, even giving Mallet the benefit of the 228-day COVID toll, any Eighth Amendment claim against Dr. Stellato based on his 2017 treatment of Plaintiff would be untimely.  A claim accruing in 2017 would ordinarily have expired in 2020; the COVID toll would extend that deadline by 228 days, into 2021, but not to February 25, 2022, when Mallet filed this action.

Accordingly, Defendants' motion for summary judgment on statute-of-limitations grounds is DENIED as to Mallet's surviving Eighth Amendment claim against Dr. Makram.  To the extent

the Eighth Amendment claim against Dr. Stellato were not dismissed on the merits, it would also be barred by the statute of limitations.

### D.  Qualified Immunity

Defendants also invoke qualified immunity.  Again, because the Eighth Amendment claim against Dr. Stellato has been dismissed on the merits, the Court addresses qualified immunity only as to the surviving Eighth Amendment claim against Dr. Makram.

Qualified immunity shields officials from personal liability for civil damages so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (stating that a right is clearly established when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right").  A court asks (1) "whether the facts shown 'make out a violation of a constitutional right,'" and (2) "whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) (quoting *Pearson*, 555 U.S. at 232).  Courts may address those questions in either order. *Pearson*, 555 U.S. at 236.

"[T]he need for 'clearly established' law is satisfied if the law on the subject was defined at the time with reasonable clarity or clearly foreshadowed in rulings of the Supreme Court or the Second Circuit, so that the defendant should have understood that her conduct was unlawful." *Lynch v. Ackley*, 811 F.3d 569, 578–79 (2d Cir. 2016).  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Wilson v. Layne*, 526 U.S. 603, 615 (1999).  Put simply, qualified immunity "provides ample

protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Dr. Makram is not entitled to qualified immunity at summary judgment.

*First,* as discussed, *see supra* Section IV(C)(2)(c), the record, viewed in Mallet's favor, permits a reasonable jury to find that Dr. Makram violated the Eighth Amendment by consciously disregarding a substantial risk that Mallet's persistent urinary symptoms reflected prostate cancer. That satisfies the first qualified-immunity prong.

*Second,* the relevant right was clearly established during the period at issue. The right should not be defined at the overly specific level of whether a prisoner with Mallet's exact symptoms, cystoscopy findings, Flomax history, and PSA values was entitled to repeat PSA testing or a renewed urology referral. Clearly established law need not identify "a case directly on point," but it must be "dictated by controlling authority or a robust consensus of cases of persuasive authority." *D.C. v. Wesby*, 583 U.S. 48, 63 (2018) (citation omitted); *see also Kisela v. Hughes*, 584 U.S. 100, 104 (2018). Here, the right at issue is the right of a convicted prisoner not to have a prison medical provider consciously disregard a substantial risk of serious harm by refusing or delaying reasonable medical evaluation or treatment for a serious medical need.

That right was clearly established long before 2017. In *Estelle*, the Supreme Court held that "deliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment. 429 U.S. at 104. Likewise, in *Farmer*, the Court held that an official violates the Eighth Amendment when the official "knows of and disregards an excessive risk to inmate health or safety." 511 U.S. at 837. In *Chance*, the Second Circuit held that a physician may act with deliberate indifference by consciously choosing "an easier and less efficacious" treatment plan. 143 F.3d at 703. And, in *Harrison*, the Second Circuit held that, if prison officials deliberately

ignore a condition requiring treatment, "the failure to provide appropriate treatment might well violate the Eighth Amendment." 219 F.3d at 137 (quoting *Chance*, 143 F.3d at 702).

If the jury credits Defendants' version of the facts, Dr. Makram likely did not violate the Eighth Amendment at all: she reasonably understood Mallet's symptoms as consistent with BPH, bladder dysfunction, or a neurological problem; relied on specialist input; and treated a chronic urinary condition. But if the jury credits Mallet's version, Dr. Makram knew that his urinary obstruction persisted despite treatment, knew that the cystoscopy did not rule out prostate cancer, had before her an October 2018 PSA result that Plaintiff says reflected a medically significant increase from prior values, and still failed to order repeat PSA testing, refer him back to urology, or pursue any cancer-related follow-up. Dkt. No. 75, ¶¶ 145–55, 169–87; Dkt. No. 76-7 at 10–11.

On Plaintiff's version of the facts, a reasonable medical provider would have understood that consciously disregarding the risk of prostate cancer violated the Eighth Amendment. The qualified-immunity question therefore turns on disputed facts that are material to both the constitutional violation and the objective-reasonableness inquiry – namely, what Dr. Makram knew, what she inferred from the information before her, and whether her failure to pursue further testing or referral was a reasonable medical response or conscious disregard of a serious risk. These specific factual disputes cannot be resolved in Defendants' favor on summary judgment. *See Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999) ("Summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness.").

Defendants' motion for summary judgment on qualified-immunity grounds is therefore DENIED as to the remaining Eighth Amendment claim against Dr. Makram.

### E.  State-Law Malpractice and Negligence

New York Correction Law § 24 provides that, "No civil action shall be brought in any court of the state . . . against any officer or employee of the department . . . in his or her personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee."  N.Y. Correct. Law § 24(1).  The statute further provides that, "Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state."  *Id.*, § 24(2).

The Second Circuit's decision in *Baker v. Coughlin*, 77 F.3d 12 (2d Cir. 1996) controls the effect of § 24 in this Court.  There, the plaintiff argued that § 24 barred covered personal-capacity state-law claims in New York state court but did not bar the same state-law claims in federal court. The Second Circuit rejected that argument.  It explained that § 24(2), "by its plain terms, precludes the assertion of claims against corrections officers in any court, including the federal courts."  *Id.* at 15.  The Circuit also rejected the notion that the phrase "in any court of the state" in § 24(1) preserved a federal forum for state-law tort claims.  A federal court exercising supplemental jurisdiction over state-law claims "acts essentially as a state court," and therefore must apply state substantive law, including state-law restrictions on whether the claim may be brought at all.  *Id.* As *Baker* put it, "If a state would not recognize a plaintiff's right to bring a state claim in state court, a federal court exercising pendent jurisdiction, standing in the shoes of a state court, must follow the state's jurisdictional determination and not allow that claim to be appended to a federal law claim in federal court."  *Id.* (quoting *Promisel v. First Am. Artificial Flowers, Inc.*, 943 F.2d 251, 257 (2d Cir. 1991), *cert. denied*, 502 U.S. 1060 (1992)).

*Baker* further held that § 24 is not merely a procedural or indemnification provision. Rather, "by its plain terms, § 24 governs the substantive rights of corrections officers by conferring upon them an immunity from liability for activities that fall within the scope of the statute." *Id.* at 15. The Circuit therefore concluded that DOCCS officers and employees "are entitled to invoke the benefits of § 24 irrespective of the forum" and that, because a New York court would have dismissed the state-law claims under § 24, the federal district court was required to do the same. *Id.* at 16.

Courts therefore routinely dismiss state-law claims against DOCCS employees when the challenged conduct occurred within the scope of their employment. *See, e.g.*, *Hassell v. Fischer*, 96 F. Supp. 3d 370, 385 (S.D.N.Y. 2015) ("The Second Circuit has held that [Correction Law § 24] prevents federal courts from exercising pendent jurisdiction over state law claims appended to federal claims brought pursuant to 42 U.S.C. § 1983."). Conduct falls within the scope of employment when the employee is carrying out assigned duties, even if the conduct is alleged to have been performed wrongfully. *See Ierardi v. Sisco*, 119 F.3d 183, 187 (2d Cir. 1997) (citing *Riviello v. Waldron*, 47 N.Y.2d 297, 302 (1979)).

That rule bars Mallet's state-law claims against Dr. Makram. Relevant factors in determining whether conduct falls within the scope of employment include:

> the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated.

*Id.* Here, the alleged malpractice and negligence arise from Dr. Makram's treatment decisions, referral decisions, review of medical records, and alleged failure to follow up while she was serving as Facility Health Services Director and medical provider at Woodbourne. Those alleged acts and omissions occurred at Woodbourne, concerned an incarcerated patient in DOCCS

custody, and were part of the medical functions Dr. Makram was employed to perform.  Whether her conduct was negligent, wrongful, or deliberately indifferent does not change the § 24 analysis. *See Cruz v. New York*, 24 F. Supp. 3d 299, 310 (W.D.N.Y. 2014).  Mallet's claims clearly arise from acts or omissions within the scope of Dr. Makram's employment with DOCCS and in the discharge of her duties there.

This Court therefore lacks jurisdiction over Mallet's state-law malpractice and negligence claims against Dr. Makram.  *See Parris v. New York State Dep't Corr. Servs.*, 947 F. Supp. 2d 354, 365 (S.D.N.Y. 2013).  Those claims are DISMISSED without prejudice to whatever claim, if any, Mallet has properly pursued or may properly pursue against the State of New York in the New York Court of Claims.  The Court expresses no view on the timeliness or merits of any such claim.

The malpractice claim against Dr. Stellato, however, survives summary judgment. Although Mallet pleads both malpractice and negligence, the claim against Dr. Stellato sounds in medical malpractice.  "In determining whether an action sounds in medical malpractice or simple negligence, the critical question is the nature of the duty to the plaintiff which the defendant is alleged to have breached." *La Russo v. St. George's Univ. Sch. of Med.*, 936 F. Supp. 2d 288, 304 (S.D.N.Y. 2013) (citing *Stanley v. Lebetkin*, 507 N.Y.S.2d 468, 468 (2d Dep't 1986)).  "When the duty arises from the physician-patient relationship or is substantially related to medical treatment, the breach gives rise to an action sounding in medical malpractice, not simple negligence." *Id.* Mallet's theory against Dr. Stellato plainly arises from a physician-patient relationship.

Accordingly, Defendants' motion for summary judgment dismissing Mallet's negligence claim against Stellato is GRANTED.  *See Darley v. United States*, 2025 WL 1159518, at *5 (S.D.N.Y. Apr. 21, 2025) (dismissing negligence claim as duplicative because it sounds in medical

malpractice).  The Court analyzes the surviving state-law claim against Dr. Stellato as one for medical malpractice.

"Under New York law, a medical malpractice claim requires a showing of: (1) a deviation or departure from accepted practice, and (2) evidence that such departure was a proximate cause of injury or damage." *Schoolcraft v. City of New York*, 103 F. Supp. 3d 465, 534 (S.D.N.Y. 2015) (citing *Stukas v. Streiter*, 918 N.Y.S.2d 176, 184 (N.Y. 2011)).  The record, as described above, contains evidence from which Plaintiff can argue that Dr. Stellato's 2017 urological evaluation departed from accepted medical practice and contributed to the delayed diagnosis of prostate cancer.  Dr. Stellato saw Mallet for urinary and bladder dysfunction, performed a DRE and later a cystoscopy, did not order a PSA test or biopsy, and acknowledged that cystoscopy cannot confirm or rule out prostate cancer.  Dkt. No. 75, ¶¶ 164–80.  Defendants dispute the significance of that evidence and maintain that Dr. Stellato reasonably attributed Mallet's symptoms to BPH, bladder dysfunction, or a possible neurological cause.  But on the present briefing, Defendants have not shown that no reasonable jury could find a departure from accepted practice or causation.  That dispute goes to the adequacy of the urological evaluation, and Dr. Stellato has not shown that it can be resolved in his favor as a matter of law.  *See Leavy v. Merriam*, 20 N.Y.S.3d 117, 119 (2015).

The Court's ruling on Dr. Branch also informs why the claim cannot be resolved on the current record.  As explained above, Defendants' motion to strike Dr. Branch's expert affidavit and preclude him from testifying is denied, subject to limited expert discovery.  *See supra* Section IV(A)(2).  That ruling means Plaintiff is not barred, at summary judgment, from relying on expert evidence concerning the adequacy of the prostate-cancer evaluation and follow-up.  It also means Defendants will have an opportunity before trial to depose Dr. Branch, obtain rebuttal expert

evidence if appropriate, and test Plaintiff's expert proof through motions *in limine* or Federal Rule of Civil Procedure 50.  In these circumstances – and given that Defendants have not developed a separate merits argument showing that Plaintiff lacks legally sufficient expert proof against Dr. Stellato – Defendants have not shown that they are entitled to judgment as a matter of law on Mallet's state-law medical-malpractice claim against Dr. Stellato.

Mallet's state-law malpractice and negligence claims against Dr. Makram are DISMISSED without prejudice for lack of jurisdiction under Correction Law § 24.  Defendants' motion for summary judgment is DENIED as to Mallet's state-law medical-malpractice claim against Dr. Stellato.

### F.  Supplemental Jurisdiction

The Court will retain supplemental jurisdiction over the medical-malpractice claim against Dr. Stellato.  Section 1367(a) provides that, "Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute," when a district court has original jurisdiction over an action, it "shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  Section 1367(c) provides that district courts "may decline to exercise supplemental jurisdiction" if the claim "raises a novel or complex issue of State law," "substantially predominates over the claim or claims over which the district court has original jurisdiction," the court "has dismissed all claims over which it has original jurisdiction," or, "in exceptional circumstances, there are other compelling reasons for declining jurisdiction."  *Id.*, § 1367(c)(1)–(4).

The analysis proceeds in three steps: "(1) is the state claim within the mandatory supplemental jurisdiction of the Court, because it forms 'part of the same case or controversy' as the federal claims; (2) if so, does the case fall within one of the specified circumstances that permit

the Court to decline to exercise supplemental jurisdiction; (3) if so, do the values of 'economy, convenience, fairness and comity' support retaining jurisdiction or dismissing the claim." *Bu ex rel. Bu v. Benenson*, 181 F. Supp. 2d 247, 251 (S.D.N.Y. 2001).  This approach is consistent with the Second Circuit's instruction that § 1367 "has indeed altered *Gibbs*' discretionary analysis": supplemental jurisdiction is "mandatory" under § 1367(a) unless one of § 1367(c)'s enumerated grounds permits the court to decline it.  *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 447 (2d Cir. 1998).  If such a ground exists, the court's discretion is guided by the familiar *Gibbs* values of "judicial economy, convenience and fairness to litigants."  *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).

The three-step analysis supports retaining jurisdiction here.

*First,* the malpractice claim against Dr. Stellato and the surviving Eighth Amendment claim against Dr. Makram arise from the same alleged failure to respond adequately to Mallet's urinary symptoms and the same risk of prostate-cancer while he was in DOCCS custody.  They therefore form part of the same Article III case or controversy.  *See Bu*, 181 F. Supp. 2d at 251 ("Essentially, supplemental jurisdiction will be found where the state and federal claims arise from the same basic facts.").

*Second,* none of the § 1367(c) grounds applies.  The malpractice claim does not raise a novel or complex issue of state law; it does not substantially predominate over the surviving federal claim; the Court has not dismissed all claims over which it has original jurisdiction; and there are no exceptional circumstances or compelling reasons for declining jurisdiction.  *See* 28 U.S.C. § 1367(c)(1)–(4).

*Third,* even if the Court had discretion to decline jurisdiction, the *Gibbs* values would favor retention.  Trying the remaining federal and state claims together will promote judicial economy,

convenience, and fairness, and the remaining state-law issue is not novel, unsettled, or unusually sensitive. The Court will therefore retain supplemental jurisdiction over Mallet's state-law medical-malpractice claim against Dr. Stellato.

## Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.

Defendants' motion for summary judgment is DENIED as to Mallet's Eighth Amendment deliberate-indifference claim against Dr. Makram, and is also DENIED as to Defendants' statute-of-limitations and qualified-immunity defenses to that claim. Defendants' motion for summary judgment is GRANTED as to Mallet's Eighth Amendment deliberate-indifference claim against Dr. Stellato. Defendants' motion for summary judgment is also GRANTED as to Mallet's remaining Section 1983 claims and theories, including his Fifth and Fourteenth Amendment medical-care theories, retaliation claim, failure-to-intervene claim, supervisory-liability theory, and Section 1983 conspiracy claim.

As to the state-law claims, Mallet's state-law malpractice and negligence claims against Dr. Makram are DISMISSED without prejudice for lack of jurisdiction under New York Correction Law § 24. As to Dr. Stellato, Defendants' motion for summary judgment is GRANTED on Mallet's ordinary-negligence claim and DENIED on Mallet's medical-malpractice claim.

The case will proceed to trial against Dr. Makram on the Eighth Amendment deliberate-indifference claim and against Dr. Stellato on the state-law medical-malpractice claim.

The Clerk of Court is respectfully directed to terminate the motions at Docket Numbers 64, 77, and 84. This constitutes the Opinion and Order of the Court. It is a written decision.

Dated: June 11, 2026
        New York, New York

_____
                                U.S.D.J.

BY ECF TO ALL COUNSEL